[No. F060788. Fifth Dist. Nov. 14, 2011.]

NICHOLAS HONCHARIW, as Trustee, etc., Plaintiff and Appellant, v. COUNTY OF STANISLAUS et al., Defendants and Respondents.

**COUNSEL**

Nicholas Honchariw for Plaintiff and Appellant.

Porter Scott, Carl L. Fessenden, Kristina M. Hall and Ashley M. Wisniewski for Defendants and Respondents.

**OPINION**

**FRANSON, J.—**

## INTRODUCTION

Government Code section 65589.5[1] is known as the Housing Accountability Act (see § 65589.5, subd. (*o*)), and has been referred to colloquially as the " 'Anti NIMBY' law."[2] (*Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245, 1253, fn. 9 [102 Cal.Rptr.3d 394].) The purpose of the

---

[1] All further statutory references are to the Government Code unless noted otherwise.
[2] NIMBY is the acronym for "Not-In-My-Back-Yard."

statute is to limit the ability of local governments to "reject or make infeasible housing developments . . . without a thorough analysis of the economic, social, and environmental effects of the action . . . ." (§ 65589.5, subd. (b).) Subdivision (j) of the statute provides that "[w]hen a proposed housing development project complies with applicable, objective general plan and zoning standards and criteria, including design review standards, in effect at the time that the housing development project's application is determined to be complete," a local agency which "proposes to disapprove the project . . . shall base its decision regarding the proposed housing development project upon written findings supported by substantial evidence on the record that . . . [¶] (1) [t]he housing development project would have a specific, adverse impact upon the public health or safety unless the project is disapproved . . ." and "(2) [t]here is no feasible method to satisfactorily mitigate or avoid the adverse impact . . . other than the disapproval of the housing development project . . . ."

In the present case, respondent Board of Supervisors of the County of Stanislaus (the Board) voted not to approve appellant Nicholas Honchariw's proposed development project. The Board did not make any section 65589.5, subdivision (j) findings (hereinafter section 65589.5(j)). Appellant brought an administrative mandamus action in superior court to obtain what he contended was the required compliance with the statute. The superior court concluded that section 65589.5(j) findings were not required because the project did not comply with "applicable, objective general plan and zoning standards and criteria, including design review standards, in effect . . . ." (§ 65589.5(j).) Specifically, the court found that appellant's proposed project did not comply with section 20.52.210 of the Stanislaus County Code, which provides that "[a]ll lots of a subdivision shall be connected to a public water system . . . whenever available." Four of the proposed parcels of appellant's proposed eight-parcel project had a public water system (the Knights Ferry Community Services District; hereinafter KFCSD) "available" to them as that term is defined in the Stanislaus County Code.[3] The trial court ruled that because appellant did not comply with this county ordinance, the county was not required to make section 65589.5(j) findings when it denied the proposed development project.

---

[3] *Stanislaus County Code (County Code) section 20.52.210 states in pertinent part:* "All lots of a subdivision shall be connected to a public water system . . . whenever available. . . . [P]ublic water systems are considered as being available whenever a system is located within two thousand six hundred forty feet of any part of the property being subdivided, and the proposed subdivision lies within a . . . water service area adopted by the governing board of the system. Installation of . . . water systems shall include all appurtenances and service liens to the boundary of every lot in the subdivision."

On this appeal, appellant contends that his proposed project complied with "applicable, objective general plan and zoning standards and criteria, including design review standards, in effect . . . ." (§ 65589.5(j).) Respondents, the County of Stanislaus (County) and the Board, contend that section 65589.5 applies only to housing development projects involving "affordable" housing and, since appellant's proposed project does not implicate affordable housing concerns, section 65589.5 is not applicable at all. Respondents also contend that even if appellant's project is a "proposed housing development project" within the meaning of section 65589.5(j), the Board could not have found that appellant's proposed project complied with "applicable, objective general plan and zoning standards and criteria, including design review standards" because the proposed project did not comply with County Code section 20.52.210. Therefore, the Board was not required to make the section 65589.5(j) findings of a specific adverse impact and no feasible method to satisfactorily mitigate or avoid that impact.

■ As we shall explain, we reject respondents' contention that section 65589.5(j) applies only to housing development projects involving affordable housing. The statute expressly defines "housing development project" to include residential units (see § 65589.5, subd. (h)), and nothing in that definition limits the reach of the phrase "housing development project" to projects involving affordable housing. We also conclude that there is nothing in the record to support a finding that appellant ever failed to comply with County Code section 20.52.210, and the superior court erred in concluding that appellant's proposed project was not in compliance with that County ordinance. We therefore reverse the decision of the superior court, and direct that court to issue a writ of mandate directing the Board to vacate its March 24, 2009, decision denying appellant's subdivision map application, and further directing the Board to conduct further proceedings in compliance with our decision in this case.

## FACTS

Appellant proposed to divide a 33.7-acre parcel, overlooking the Stanislaus River in the Knights Ferry area of the County, into eight parcels ranging in size from 0.5 to five acres. Specifically, there would be three 5-acre lots (lots 1 through 3), four 1-acre lots (lots 4 through 7), one 0.5-acre lot (lot 8), and a 12.03-acre "remainder," which would remain undeveloped. The western portion of the project area, on which the three 5-acre parcels and 4.42 acres of the remainder would be located, is zoned "General Agriculture." The eastern portion, on which the four 1-acre lots, the 0.5-acre lot, and 7.61 acres of the remainder would be located, is zoned "Historical Site District." The proposed 0.5-acre parcel (lot 8) already has a dwelling with water service

from the KFCSD. Under "historical" zoning, one acre is the minimum parcel size for allowing a private well. All of the proposed parcels in both zoning areas except the 0.5-acre parcel (i.e., all of lots 1 through 7) would be served by private wells.

The historical portion of the project area, which would include the four 1-acre parcels, lies within the service area of the KFCSD. The western portion does not. The KFCSD issued a "Will Not Serve" letter regarding the proposed project. It refused to provide water service other than what it was already providing to the dwelling on what would be the 0.5-acre lot (lot 8) located on the eastern edge of the project area. At the County Planning Commission staff's direction, appellant therefore applied for an "exception" to County Code section 20.52.210, which requires all subdivision lots be connected to a public water system whenever a system is "available." The proposed one-acre lots would be deemed to have a public water system available to them under section 20.52.210.[4] The County Code permits the granting of an exception to County Code section 20.52.210 if certain findings are made. (County Code, § 20.64.030.)

On February 5, 2009, a hearing was held before the County Planning Commission (Planning Commission) for consideration of both the entire project application and the exception to the County Code section 20.52.210 requirements for the four parcels. Several area residents spoke out against the creation of one-acre lots in the project area. Among other reasons, they expressed concerns about traffic safety, well water availability, contamination from septic tanks and maintaining the historical integrity of the area. The Planning Commission voted six to two to deny appellant's subdivision project application and to deny his request for an exception to County Code section 20.52.210.

Appellant exercised his right to appeal the Planning Commission's decisions to the Board. A hearing was held on March 24, 2009. Similar concerns were again expressed, and the Board voted five to zero to disapprove appellant's subdivision project application and to deny his request for an exception to County Code section 20.52.210.

---

[4] See footnote 3, *ante*, at page 1069. As counsel for respondents explained in his oral argument to this court, the County wishes to have subdivision lots connected to a public water system even when, as here, that public water system refuses to provide water. This is so the connection will exist if water becomes available at some future time. Thus, the ordinance considers a public water system to be "available" to a subdivision lot when the requirements of the ordinance are met even if no actual water is available to the lot from the available public water system.

## STANDARD OF REVIEW

Subdivision (m) of section 65589.5 provides that "[a]ny action brought to enforce the provisions of this section shall be brought pursuant to Section 1094.5 of the Code of Civil Procedure . . . ." Subdivision (b) of Code of Civil Procedure section 1094.5 pertains to judicial review of administrative decisions and states: "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." Appellant contends that the Board has not "proceeded in the manner required by law" because his proposed project "complies with applicable, objective general plan and zoning standards and criteria" (§ 65589.5(j)) and the Board therefore could not lawfully deny approval of the project without making "written findings supported by substantial evidence on the record" that the project "would have a specific, adverse impact upon the public health or safety unless the project is disapproved" and "[t]here is no feasible method to satisfactorily mitigate or avoid the adverse impact identified . . . ." (§ 65589.5(j)(1) & (2).)

## I.

## APPELLANT'S PROPOSED PROJECT IS A "PROPOSED HOUSING DEVELOPMENT PROJECT"

### A.

We first address respondents' contention that appellant's project is not a "proposed housing development project" within the meaning of section 65589.5(j), because section 65589.5 applies only to proposed housing development projects which propose to build "affordable" housing.[5]

---

[5] Subdivision (j) of section 65589.5 states in its entirety: "When a proposed housing development project complies with applicable, objective general plan and zoning standards and criteria, including design review standards, in effect at the time that the housing development project's application is determined to be complete, but the local agency proposes to disapprove the project or to approve it upon the condition that the project be developed at a lower density, the local agency shall base its decision regarding the proposed housing development project upon written findings supported by substantial evidence on the record that both of the following conditions exist: [¶] (1) The housing development project would have a specific, adverse impact upon the public health or safety unless the project is disapproved or approved upon the condition that the project be developed at a lower density. As used in this paragraph, a 'specific, adverse impact' means a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions

■ "When construing a statute, we must 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' (*DuBois* v. *Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].) The words of the statute are the starting point. 'Words used in a statute . . . should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . .' (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299] (*Lungren*).) If the language permits more than one reasonable interpretation, however, the court looks 'to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1008 [239 Cal.Rptr. 656, 741 P.2d 154].) After considering these extrinsic aids, we 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' (*People* v. *Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].)" (*Wilcox* v. *Birtwhistle* (1999) 21 Cal.4th 973, 977–978 [90 Cal.Rptr.2d 260, 987 P.2d 727].)

We begin with the words of the statute. They appear to us to be clear and unambiguous. Subdivision (h) of section 65589.5 defines the term "housing development project." It states:

"(h) The following definitions apply for the purposes of this section: [¶] . . . [¶]

"(2) 'Housing development project' means a use consisting of any of the following:

"(A) Residential units only.

"(B) Mixed-use developments consisting of residential and nonresidential uses in which nonresidential uses are limited to neighborhood commercial uses and to the first floor of buildings that are two or more stories. As used in this paragraph, 'neighborhood commercial' means small-scale general or

---

as they existed on the date the application was deemed complete. [¶] (2) There is no feasible method to satisfactorily mitigate or avoid the adverse impact identified pursuant to paragraph (1), other than the disapproval of the housing development project or the approval of the project upon the condition that it be developed at a lower density."

specialty stores that furnish goods and services primarily to residents of the neighborhood.

"(C) Transitional housing or supportive housing."

■ There is no dispute that the project envisions only a single-family dwelling to ultimately be constructed on each of the eight proposed lots. The anticipated use is thus "[r]esidential units only" (§ 65589.5, subd. (h)(2)(A)), and the proposed project is therefore a "proposed housing development project" within the meaning of section 65589.5(j).

## B.

Respondents argue that because section 65589.5(j) appears in a statute which addresses, in other subdivisions, matters pertaining to what respondents refer to as affordable housing, subdivision (j) must be construed also as applying only to proposed housing development projects involving affordable housing. We find this contention unpersuasive for two reasons. First, as we have already explained, such a construction would contradict the express definition of "housing development project" appearing in the statute. Second, even if we were to find some ambiguity in the statute, we see nothing in the legislative history of the statute to support respondents' contention that subdivision (j) was intended to apply only to proposed housing development projects involving affordable housing.

Section 65589.5 was originally enacted in 1982, as part of a statutory scheme to address a critical statewide housing shortage and to facilitate the development of housing adequate for the needs of all economic segments of the population (§ 65580). At that time, section 65589.5 read in its entirety: "When a proposed housing development project complies with the applicable general plan, zoning, and development policies in effect at the time that the housing development project's application is determined to be complete, but the local agency proposes to disapprove the project or to approve it upon the condition that the project be developed at a lower density, the local agency shall base its decision regarding the proposed housing development project upon written findings supported by substantial evidence on the record that both of the following conditions exist: [¶] (a) The housing development project would have a specific, adverse impact upon the public health or safety unless the project is disapproved or approved upon the condition that the project be developed at a lower density. [¶] (b) There is no feasible method to satisfactorily mitigate or avoid the adverse impact identified pursuant to subdivision (a), other than the disapproval of the housing development

project or the approval of the project upon the condition that it be developed at a lower density." (Stats. 1982, ch. 1438, § 2, p. 5484.) The statute's purpose was "to assure that local governments did not ignore their own housing development policies and general plans when reviewing housing development proposals." (*North Pacifica, LLC v. City of Pacifica* (N.D.Cal. 2002) 234 F.Supp.2d 1053, 1058, disapproved on other grounds in *North Pacifica LLC v. City of Pacifica* (2008) 526 F.3d 478.) In 1990, in response to growing concerns over lack of "affordable" housing[6] caused in part by local governments' policies limiting approval of affordable housing, leading to discrimination against various social groups, legislation making it more difficult to disapprove housing projects was enacted. The original section 65589.5 was placed unchanged as subdivision (j) within a greatly expanded section 65589.5. (Stats. 1990, ch. 1439, § 1, p. 6552.) The statute later became known as the Housing Accountability Act. (§ 65589.5, subd. (*o*); see Stats. 2006, ch. 888, § 5, p. 6877.)

Respondents argue that the placing of the original 1982 language into the middle of a statute addressing housing for low-income households transformed the meaning of the language "a proposed housing development project" so that it now means "a proposed housing development project providing housing for very low, low-, or moderate-income households." Case law addressing that contention has rejected it, as we do. (*North Pacifica, LLC v. City of Pacifica, supra,* 234 F.Supp.2d 1053 [§ 65589.5(j) applies to housing development projects generally, not just to affordable housing].) Subdivision (d) of the statute directs a local agency to make essentially the same findings as those appearing in subdivision (j) when the agency disapproves a "housing development project . . . for very low, low-, or moderate-income households." (§ 65589.5, subd. (d).) Subdivision (j) would thus appear to be duplicative of subdivision (d) if subdivision (j) were to be construed as applying only to the same housing development projects as subdivision (d). As outlined above, section 65589.5 was originally enacted as part of a statutory scheme to facilitate the development of housing adequate for the needs of "all economic levels" of the population (§ 65580, subd. (b)).

In *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704 [29 Cal.Rptr.2d 182], the city approved a subdivision map application for 45 lots for single-family residences. The city rejected a proposed 36-unit alternative, and expressly found that the approved 45-lot project would not have any adverse impact upon the public health or safety.

---

[6] Affordable housing is now called "housing . . . for very low, low-, or moderate-income households" (§ 65589.5, subd. (d)).

(*Id.* at p. 716.) The city also expressly found that any reduction in density of the project would violate section 65589.5(j), because the city could not find that the 45-unit project would have any such adverse impact. (*Sequoyah Hills Homeowners Assn., supra*, 23 Cal.App.4th at pp. 715–716.) Nothing in the case suggests that the application of section 65589.5(j) is limited to proposed housing development projects involving housing intended only for low-income residents, and no party to the case argued that the application of subdivision (j) was so limited. Nor is there any indication in the opinion that the 45 residences were intended for low-income occupants. Although the opinion notes that the lower density 36-unit alternative would result in those houses being necessarily more expensive than the houses of the ultimately approved 45-unit project (23 Cal.App.4th at p. 715), a result the city wished to avoid, the avoidance of such a result is precisely why the statute was enacted. "Many local governments do not give adequate attention to the economic . . . costs of decisions that result in . . . reduction in density of housing projects . . . ." (§ 65589.5, subd. (a)(4).) "California housing has become the most expensive in the nation. The excessive cost of the state's housing supply is partially caused by activities and policies of many local governments that limit the approval of housing . . . ." (§ 65589.5, subd. (a)(2).)

## C.

A 1999 amendment to subdivision (j) of section 65589.5 modified the first clause of subdivision (j) from its original 1982 language ("[w]hen a proposed housing development project complies with the applicable general plan, zoning, and development policies in effect at the time that the housing development project's application is determined to be complete") to something very close to its present day language ("When a proposed housing development project complies with applicable, *objective* general plan and zoning standards and criteria in effect at the time that the housing development project's application is determined to be complete." (Italics added.)) (Stats. 1999, ch. 968, § 6, p. 6999.) The 1999 amendments to subdivision (j) were part of a bill amending eight different statutes addressing a wide variety of different housing topics, and we see nothing in the legislative history of Senate Bill No. 948 (1999–2000 Reg. Sess.) directly addressing the purpose of the 1999 amendment to the first clause of subdivision (j) of section 65589.5. The change appears to have been intended to strengthen the law by taking away an agency's ability to use what might be called a "subjective" development "policy" (for example, "suitability") to exempt a proposed housing development project from the reach of subdivision (j). In other

words, prior to the 1999 amendment, if a proposed project was not in compliance with a local "development policy," no findings were required.

■ In 2002, the first clause of section 65589.5(j) was amended to its present form by adding the phrase "including design review standards" following the words "applicable, objective general plan and zoning standards and criteria." (Stats. 2002, ch. 147, § 1, p. 746.) We interpret that phrase to mean design review standards that are part of "applicable, objective general plan and zoning standards and criteria."

### D.

Neither the 1999 amendment nor the 2002 amendment addressed the meaning of "housing development project." However, a 2003 amendment to section 65589.5 added the subdivision (h) definition of "housing development project" and included "[r]esidential units" (a definition which applies "for the purposes of this section"—i.e., for all of § 65589.5, including subd. (j) of that code section). (See Stats. 2003, ch. 793, § 3, p. 5871.) *North Pacifica, LLC v. City of North Pacifica, supra*, 234 F.Supp.2d at page 1058, which held that section 65589.5 is not limited to affordable housing development projects, was decided in November of 2002. If the Legislature thought that *North Pacifica* had misconstrued what the Legislature had meant by the words "housing development project," the Legislature presumably would have crafted a definition defining the term to mean "residential units for very low, low-, or moderate-income households." Instead, the Legislature defined "housing development project" to include all "[r]esidential units only" developments.

### II.

### RESPONDENTS FAILED TO DEMONSTRATE THAT APPELLANT'S PROPOSED PROJECT DOES NOT COMPLY WITH "APPLICABLE, OBJECTIVE GENERAL PLAN AND ZONING STANDARDS AND CRITERIA INCLUDING DESIGN REVIEW STANDARDS"

Before the Board's hearing on appellant's project application, and again at that hearing, appellant informed the Board of appellant's position that the proposed project complied with all applicable, objective general plan and zoning standards and criteria, and that the Board therefore could not deny his project application without making the findings specified in section 65589.5(j) (i.e., that the project would have a specific, adverse impact and there is no satisfactory method to mitigate or avoid that adverse impact). Appellant also

told the Board that any such findings would have to be supported by substantial evidence in the record.

At the Board hearing, Supervisor Grover asked John P. Doering, County Counsel, if he could "clarify for us . . . what you are perceiving [appellant's] position to be and then where you feel legal direction falls." Mr. Doering advised the Board that in his view "this particular subdivision (j) is not necessarily applicable in this case." He explained that in his view the Board should first decide whether the proposed project complied with "the county requirements set forth by ordinance[]," particularly those listed in County Code section 20.12.140.[7] He opined that if the Board "should find that those findings can be made" (i.e., that approval of the project would not violate § 20.12.140—*ante*, fn. 7) and "the Board [ultimately] decided to deny a project based on other criteria" the Board would have to make the section 65589.5(j) findings. Doering stated this view again: "unless and until the Board makes all of the required findings cited by Government Code section [66474] and Stanislaus County code section [20.12.140]," written findings pursuant to section 65589.5(j) are not required.

At the conclusion of the hearing, the Board passed a motion to deny appellant's project application on the basis that "pursuant to Stanislaus County Code §20.12.140 . . . the project site is not physically suitable for the proposed development . . . ." (One of the specific findings required under

---

[7] County Code section 20.12.140 states in relevant part: "A tentative map shall not be approved or conditionally approved by the commission if it makes any of the following findings: [¶] A. That the proposed map is not consistent with applicable general and specific plans; [¶] B. That the design or improvements of the proposed subdivision is not consistent with applicable general and specific plans; [¶] C. That the site is not physically suitable for the proposed density of development; [¶] D. That the site is not physically suitable for the type of development; [¶] E. That the design of the subdivision or the proposed improvements are likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat; [¶] F. That the design of the subdivision or the type of improvements are likely to cause serious public health problems . . . ." This County Code section essentially restates the language of Government Code section 66474, except that the County Code section pertains to denial of approval of a tentative map "by the commission" whereas section 66474 pertains to denial of an approval of a tentative map by, as here, "[a] legislative body of a city or county" (§ 66474). Both of these sections instruct the decisionmaking body to deny approval if it makes a "finding[]" that the proposed map is *not* consistent with applicable general and specific plans, or that the site is *not* physically suitable, etc. The County staff's report to the Board explained that to approve appellant's application, the Board must find that the proposed map *is* consistent with applicable general and specific plans, and *is* physically suitable, etc. These requirements for approval of the application, stated in positive form, are what Mr. Doering referred to as the "county requirements set forth by ordinance[]" and also as "the required findings cited by Government Code section [66474] and Stanislaus County code section [20.12.140]." (Italics added.)

§ 20.10.140 for tentative map approval.)[8] The Board made no section 65589.5(j) findings, apparently on the basis of the advice it had received that no subdivision (j) findings need be made if the Board concluded (as it ultimately did) that the site was not "physically suitable" for appellant's proposed project (see County Code, § 20.12.140, subds. C & D). We hold otherwise. A finding by the County, pursuant to County Code section 20.12.140 or Government Code section 66474, that a project site is "not physically suitable" does not relieve the County from compliance with section 65589.5(j) if the threshold compliance standards of that statute are met and if the County denies approval for reasons other than compliance with "applicable, objective general plan and zoning standards and criteria, including design review standards, in effect . . . ."

Section 65589.6 provides that "[i]n any action taken to challenge the validity of a decision by a city, county, or city and county to disapprove a project . . . pursuant to Section 65589.5, the . . . county shall bear the burden of proof that its decision has conformed to all of the conditions specified in Section 65589.5." When appellant filed the petition for writ of administrative mandamus in superior court, respondents attempted to meet this burden by arguing that appellant's project did not comply with "applicable, objective general plan and zoning standards and criteria, including design review standards, in effect . . ." because the project did not, in respondents' view, comply with County Code section 20.52.210, the ordinance requiring all lots of a subdivision be "connected to a public water system . . . whenever available," or with County Code section 20.12.140.

Respondents persuaded the trial court that they were not in violation of section 65589.5(j), because (1) County Code section 20.52.210 (the public

---

[8] The motion passed by the Board on a vote of five to zero stated: "Based upon the staff report, presentations by staff, including PowerPoint presentations, all comments and testimony received during the public hearing, and all materials that were supplied to the Board and were taken into consideration in making the decision, the Board denied the appeal and upheld the Planning Commission's decision of denial of Vesting Tentative Subdivision Map Application #2006-06 and Exception Application #2008-02, Knights Ferry Overlook; the Board finds and determines the following: (a) pursuant to Stanislaus County Code §20.12.140 that the site is not physically suitable for the proposed development in that the project would create split zoning, and that the project would result in septic systems that are close to an existing OID canal and an existing pond, which would result in water quality problems; and, (b) finds pursuant to Stanislaus County Code §20.64.030 that the $100,000 expense of extending OID [*sic*] water to the site is not a special circumstance or condition that warrants granting an exception." As we mention in the text of our opinion, the Board's denial of appellant's exception application No. 2008-02 (the application seeking an exception from compliance with the public water system connection requirement of County Code, § 20.52.210—see fn. 3, *ante*, at p. 1069) is not at issue in this appeal.

water system connection requirement), was a "design review standard[]" within the meaning of section 65589.5(j) and (2) appellant's proposed project was not in compliance with this county ordinance at the time that the project's application was determined to be complete.[9] Although we have doubts about the first of these two conclusions (since it is unclear whether this County ordinance is a general plan or zoning design review standard or criterion, and respondents fail to identify any "general plan and zoning standards and criteria," objective or otherwise, with which appellant has not complied), we need not decide that issue here.

■ However, even if we were to assume, without deciding the issue, that County Code section 20.52.210 is a "design review standard[]" within the meaning of Government Code section 65589.5(j), we see nothing in this record which would support a conclusion that appellant's proposed project fails to comply with it. County Code section 20.52.210 requires that "All lots of a subdivision shall be connected to a public water system . . . whenever available," as that term is defined. "[L]ots of a subdivision" cannot be "connected to a public water system" until those "lots of a subdivision" exist. Appellant would have no "lots of a subdivision" to connect unless and until appellant's tentative map is approved and additional steps completed and approved. Any conclusion by the trial court that the proposed project failed to comply with County Code section 20.52.210 is therefore premature and lacks evidentiary support. Concluding that appellant's proposed project did not fail to comply with County Code section 20.52.210 is consistent with the qualifying language of Government Code section 65589.5(j), which states that if a proposed project "complies with *applicable*, objective general plan and zoning standards and criteria, including design review standards . . . ," then subdivision (j) findings are triggered. The water connection requirement of County Code section 20.52.210 is only applicable, i.e., relevant and operative, when a developer or owner attempts to build a home on the lots. The Planning Commission staff recognized this when they attached a condition to the recommended approval of the tentative map application that "connection to the water system shall be made at the time of dwelling construction . . . ."

Although appellant applied for an exception from County Code section 20.52.210, and the application for the exception was denied (a decision that is not contested on this appeal), the denial of appellant's application for an exception does not equate to a lack of compliance with that County ordinance. Appellant has consistently asserted that if the project were approved, even without the granting of the requested exception, appellant would

---

[9] See footnote 3, *ante*, at page 1069.

connect the lots to the public water system as required by the County ordinance. In any event, appellant's proposed project has not yet had an opportunity to be out of compliance with the ordinance, and the trial court erred in concluding that it was.

The Board therefore "has not proceeded in the manner required by law" (Code Civ. Proc., § 1094.5, subd. (b)), in denying approval of appellant's proposed housing development project without either making the findings required by section 65589.5(j), or otherwise demonstrating how the proposed project in some manner fails to comply with "applicable, objective general plan and zoning standards and criteria, including design review standards, in effect at the time that the housing development project's application is determined to be complete . . . ." The superior court erred in concluding otherwise.

## DISPOSITION

The judgment of the superior court is reversed. The superior court shall issue a writ of mandate directing the Board as follows. The Board shall:

(1) Vacate its March 24, 2009, action denying appellant's vesting tentative map application No. 2006-06;

(2) Reconsider appellant's vesting tentative map application No. 2006-06 (application);

(3) If, in the course of that reconsideration, the Board decides to once again deny the application, the Board shall determine whether appellant's project complied with applicable, objective general plan and zoning standards and criteria in effect at the time appellant's application was determined to be complete.

(a) If the Board determines that the project did not so comply, the Board shall identify the applicable, objective general plan or zoning standards or criteria with which the project failed to comply.

(b) If the Board determines that the project did so comply, the Board shall make written findings, supported by substantial evidence on the record, that (1) the project would have a specific, adverse impact upon the public health or safety unless the project is disapproved and (2) there is no feasible method to satisfactorily mitigate or avoid that specifically identified adverse impact

other than the disapproval of appellant's application. On the issue of whether approval of the appellant's project would have a specific, adverse impact upon the public health or safety, the Board may consider any evidence any interested person may wish to present in accordance with the Board's usual and customary procedures. Costs on appeal are awarded to appellant.

Gomes, Acting P. J., and Poochigian, J., concurred.