Filed 9/29/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| KALNEL GARDENS, LLC, | B264434 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS148403) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge. Affirmed.

Loeb & Loeb, Allan J. Abshez and Elizabeth A. Camacho for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Terry Kaufmann Macias, Assistant City Attorney and Michael J. Bostrom, Deputy City Attorney for Defendants and Respondents.

———————————————

Developer Kalnel Gardens, LLC, appeals from the judgment denying its petition for a writ of administrative mandate seeking to overturn the City of Los Angeles's decision to halt a previously approved 15-unit housing project in Venice. We dismiss the appeal in part as to the developer's cause of action based on the Housing Accountability Act because the developer did not seek appellate review by way of a writ petition as required by that statute. We affirm as to the remaining causes of action because there is substantial evidence that the proposed project violated the visual and scenic elements requirement of the California Coastal Act, and because the Coastal Act takes precedence over statutes awarding density and height increase bonuses for proposed residential developments that include affordable housing units.

## FACTS AND PROCEDURAL HISTORY

In 2013, City of Los Angeles planning officials approved Kalnel Gardens, LLC's proposed project to tear down a two-story, three-unit apartment building at the triangular intersection of Mildred and Ocean Avenues and Venice Boulevard in the Venice area. The project would include a total of 15 housing units: five duplexes and five single family homes. Kalnel was allowed to exceed the normal density restrictions for that location because two of the units would be designated for very low income households. These "density bonuses" were authorized by the Housing Accountability Act (Gov. Code, § 65589.5 (HAA)), the Density Bonus Act (Gov. Code, § 65915) and the Mello Act (Gov. Code, § 65590).[1] The low income housing units also entitled Kalnel to certain other zoning concessions, including a height variance above the usual 25-foot limit. As a result, the project included a flat roofline height of 33.75 feet and a varied roofline height of 40.5 feet.

---

[1] All further undesignated section references are to the Government Code. We will sometimes refer to these three acts collectively as the housing density statutes, and we will discuss them in more detail in section 1 of our discussion.

In addition to approving the density bonuses and height variances, city planning officials adopted a mitigated negative declaration under the California Environmental Quality Act (Pub. Resources Code, § 21000, et seq. (CEQA)). Soon after, the City's advisory agency approved the project's vesting tentative tract map, including findings that the project complied with the City's General Plan as well as the Venice Specific Plan. The City's zoning administrator also approved a coastal development permit under the Coastal Act (Pub. Resources Code, § 30000, et seq.).

In September 2013, a group of neighboring residents appealed the planning department's various approvals concerning Kalnel's project, including the coastal development permit. The residents contended the project violated the Coastal Act because its height, density, setbacks, and other visual and physical characteristics were out of step with the existing neighborhood.[2]

At the December 2013 appeal hearing before the West Los Angeles Area Planning Commission (the Commission), numerous area residents spoke about how the proposed project was out of step with the unique character of the Venice neighborhood, which was described as artistic and charming. According to the residents, one- and two-story structures outnumbered taller structures in the area by a ratio of nine to one. The visual impact of the few taller structures that existed was mitigated by setbacks of as much as 200 feet, while the Kalnel project had the same 25-foot setback as did one-story homes. Many of the homes were 1920's era one-story bungalows. The project's three-story height, which included rooflines of up to 40 feet, would tower over and shadow nearby properties. The design as a whole was described as having solid stucco brown walls with no windows, articulation, or character of any kind.

These concerns were echoed in a statement by Tricia Keane, the planning director for City Council Member Mike Bonin. Keane agreed that the surrounding neighborhood

---

[2] The residents raised several other challenges to the project, including its effect on traffic, vehicular and pedestrian safety, parking, and coastal access. The trial court's judgment, and our analysis, is limited to the issue of visual and scenic compatibility under the Coastal Act.

3

consisted primarily of one- and two-story single and multi-family homes. Few, if any, "reach the height, story, scale and mass proposed by this project." The proposed project was not consistent with the character of the neighborhood, which she called the "gateway to Venice." A Commission staff member confirmed that there were only a few three-story buildings near the site of the proposed project, with everything else being one story.

Alan Abshez, counsel for Kalnel, said that there was a three-story library across the street from the project site, and that similar size structures could be found along nearby stretches of Venice Boulevard and Mildred Avenue. At bottom, however, Abshez said this was "all a case about affordable housing and density bonus." Abshez contended that the density and height of Kalnel's project were all the result of its compliance with the statutory requirement that the project include affordable housing.

Commission Vice President Donovan said that issues related to the density bonus were "outside the purview" of the appeal hearing, which instead focused on the Commission's discretionary power concerning the issuance of coastal development permits under the Coastal Act. At Donovan's suggestion the Commission found that the development did not conform to the Coastal Act because its size, height, bulk, mass, and scale were incompatible with and harmful to the surrounding neighborhood and because the setbacks were too small.[3]

Kalnel appealed the Commission's decision to the City Council, which denied the appeal and adopted the Commission's findings. Kalnel then brought an administrative mandate action against the City, alleging that it had violated the HAA, the Density Bonus Act, and the Mello Act.[4]

---

[3]     The Commission also adopted findings concerning traffic issues and other concerns.

[4]     Kalnel also stated two causes of action under federal civil rights law alleging that the City's actions violated Kalnel's constitutional due process and equal protection rights. (42 U.S.C. § 1983.) The trial court did not address that issue and neither do the parties on appeal. As a result, neither do we.

4

Distilled, the trial court found that the City had not complied with the HAA and that the density bonus, height and setback variations initially approved for the project were proper under the housing density statutes and other City zoning plans and regulations, including the Coastal Commission-approved Venice Land Use Plan. Even so, the trial court found that the three housing density statutes were subordinate to the Coastal Act and that substantial evidence supported the City's findings that the project violated that act because it was visually out of step with the surrounding coastal community.[5] Kalnel does not contend that there was insufficient evidence to support the finding that the project violated the Coastal Act. Therefore, the primary issue on appeal is whether the Coastal Act in fact takes precedence over the various housing density provisions.

## STANDARD OF REVIEW

At issue in administrative mandate proceedings is whether the agency acted without or in excess of jurisdiction, whether there was a fair hearing, and whether there was a prejudicial abuse of discretion. An abuse of discretion occurs when the agency did not proceed in the manner required by law, its order or decision is not supported by the findings, or the findings are not supported by the evidence. (Code Civ. Proc., § 1094.5, subd. (b).)

Our role is the same as the trial court's: we review the administrative record to determine whether the City's findings are supported by substantial evidence. (*Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 962 (*Reddell*).) To the extent interpretation of a statute is involved, we exercise independent review and apply the well-settled rules of statutory construction. (*Automotive Funding Group, Inc. v. Garamendi* (2003) 114 Cal.App.4th 846, 851.)

---

[5] The trial court also found that the City's original issuance of a mitigated negative declaration for the project under CEQA had been proper, and rejected two new issues raised by the City at trial: that the project violated the Venice Land Use Plan by calling for the consolidation of more than two lots, and that it hinged on the City ceding a certain portion of public right of way to the developer. Because we affirm the trial court's judgment under the Coastal Act, we need not reach those issues.

The fundamental rule of statutory construction is to ascertain the Legislature's intent in order to give effect to the purpose of the law.  (*Pasadena Metro Blue Line Construction Authority v. Pacific Bell Telephone Co.* (2006) 140 Cal.App.4th 658, 663-664 (*Pasadena Metro Blue Line*).)  We first examine the words of the statute and try to give effect to the usual, ordinary import of the language while not rendering any language surplusage.  The words must be construed in context and in light of the statute's obvious nature and purpose.  The terms of the statute must be given a reasonable and commonsense interpretation that is consistent with the Legislature's apparent purpose and intention.  (*Id.* at p. 664.)  Our interpretation should be practical, not technical, and should also result in wise policy, not mischief or absurdity.  (*Ibid.*)  We do not interpret statutes in isolation.  Instead, we read every statute with reference to the entire scheme of law of which it is a part in order to harmonize the whole.  (*20th Century Ins. Co. v. Superior Court* (2001) 90 Cal.App.4th 1247, 1275.)

If the statutory language is clear, we should not change it to accomplish a purpose that does not appear on the face of the statute or from its legislative history.  (*Pasadena Metro Blue Line, supra,* 140 Cal.App.4th at p. 664.)  If there is more than one reasonable interpretation of a statute, then it is ambiguous.  (*Joannou v. City of Rancho Palos Verdes* (2013) 219 Cal.App.4th 746, 752 (*Joannou*).)  If so, we turn to secondary rules of construction, including maxims of construction, the legislative history, and the wider historical circumstances of a statute's enactment.  (*Ibid.*)

**DISCUSSION**

1.      *Summary of the Three Housing Density Statutes*

1.1     The Housing Accountability Act (HAA)

The HAA (§ 65589.5), known as the "anti-NIMBY law,"[6] was designed to limit the ability of local governments to reject or render infeasible housing developments based on their density without a thorough analysis of the "economic, social, and environmental effects of the action . . . ."  (§ 65589.5, subd. (b).)  When a proposed development

---

[6]      NIMBY is the acronym for Not In My Backyard.

complies with objective general plan and zoning standards, including design review standards, a local agency that intends to disapprove the project, or approve it on the condition that it be developed at a lower density, must make written findings based on substantial evidence that the project would have a specific, adverse impact on the public health or safety and that there are no feasible methods to mitigate or avoid those impacts other than disapproval of the project. (§ 65589.5, subd. (j) (1) & (2).)[7]

### 1.2    The Density Bonus Act

The Density Bonus Act (§ 65915) is designed to address the shortage of affordable housing in California. (*Latinos Unidos Del Valle De Napa Y Solano v. County of Napa* (2013) 217 Cal.App.4th 1160, 1164.) When a developer agrees to set aside a certain percentage of the units in a housing development for low or very low income residents, the local agency with approval power over that development must award the developer both certain itemized concessions and a density bonus that allows an increase in density above what the zoning ordinances would ordinarily allow. (*Ibid.*)

Local governments are required to enact ordinances that implement the density bonus law (§ 65915, subd. (a)), which the City did through Los Angeles Municipal Code section 12.22.A.25. The Density Bonus Act also provides for judicial remedies if the local agency refuses to grant the required density bonus. (§ 65915, subd. (d)(3).)

### 1.3    The Mello Act

The Mello Act (§§ 65590-65590.1) establishes minimum requirements for affordable housing within the coastal zone. (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 798 (*Pacific Palisades*).) It does this in two ways: first, by requiring the construction of replacement low income housing when existing affordable housing is demolished (§ 65590, subd. (b)); second, as applicable here, by requiring new affordable housing units as part of new developments, either at the site of the new development or somewhere else (§ 65590, subd. (d)). While a local agency must require replacement affordable housing when existing affordable housing is

---

[7]    The trial court found, and the City does not dispute, that it failed to make the required findings under the HAA.

demolished within the coastal zone, the agency may reject the addition of affordable housing units in a proposed new development if those units are found to be not feasible. (§ 65590, subd. (d)). Feasibility "means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technical factors." (§ 65590, subd. (g)(3).)

2.      *The Coastal Act*

The court in *Pacific Palisades, supra,* 55 Cal.4th at pages 793-794, gave a detailed description of the Coastal Act, which we paraphrase below.

The Coastal Act (Pub. Resources Code, § 30000, et seq.), is a comprehensive scheme to govern land use planning for the state's entire coastal zone. As part of its enactment the Legislature made several findings: That the coastal zone "is a distinct and valuable natural resource of vital and enduring interest to all the people"; that permanent protection of the state's natural and scenic resources is of paramount concern; that "it is necessary to protect the ecological balance of the coastal zone"; and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of [the Coastal Act], are essential to the economic and social well-being of the people of this state . . . ." (Pub. Resources Code, § 30001, subds. (a) and (d).)

The Coastal Act is to be "liberally construed to accomplish its purposes and objectives." (Pub. Resources Code, § 30009.) In almost all cases, any development within the coastal zone requires a coastal development permit in addition to any other permits required by law from state or local governments or state and local agencies. (Pub. Resources Code, § 30600, subd. (a).)

The Coastal Act relies heavily on local government "to achieve maximum responsiveness to local conditions, accountability, and public accessibility . . . ." (Pub. Resources Code, § 30004, subd. (a).) It requires local governments to develop local coastal programs, comprised of a land use plan and implementing ordinances to promote the Coastal Act's objectives. (Pub. Resources Code, §§ 30004, subd. (a); 30001.5; 30500-30526.) In 2001 the Coastal Commission certified the City's Venice Land Use

8

Plan as the local coastal program governing the City's issuance of coastal development permits.

Once the Coastal Commission certifies a local government's program, the Coastal Commission delegates authority over coastal development permits to the local government. (Pub. Resources Code, §§ 30519, subd. (a); 30600.5, subds. (a), (b) & (c).) Under the Coastal Act, the local coastal program and development permits issued by local agencies are not just matters of local law. Instead, they embody state policy. A fundamental purpose of the Coastal Act is to ensure that state policies prevail over local government concerns.

3.      *The Appeal Must Be Dismissed in Part Because Kalnel Did Not File a Writ*
        *Petition as Required by the Housing Accountability Act*

Kalnel's first cause of action was for violation of the HAA. Even though the trial court concluded the City had violated the HAA, it denied relief under the Coastal Act. Nevertheless, Kalnel purports to appeal the denial of its HAA claim. The City contends that we must dismiss that portion of the appeal because Kalnel was required to obtain appellate review of its HAA claim by way of a writ petition.

Subdivision (m) of section 65589.5 provides that actions brought to enforce the HAA shall be brought as administrative mandate actions. Subdivision (m) also provides the mechanism for appellate review in such cases: "Upon entry of the trial court's order, a party shall, *in order to obtain appellate review of the order,* file a petition within 20 days after service upon it of a written notice of the entry of the order, or within such further time not exceeding an additional 20 days as the trial court may for good cause allow. If the local agency appeals the judgment of the trial court, the local agency shall post a bond, in an amount to be determined by the court, to the benefit of the plaintiff if the plaintiff is the project applicant." (Italics added.)

Kalnel did not ask for an additional 20 days in which to file a writ petition, and did not file a writ petition at all. Instead, within 60 days after service of notice that judgment had been entered it filed a notice of appeal as to the entire judgment. The City contends

9

that we have no jurisdiction to consider Kalnel's challenge to the judgment insofar as the HAA cause of action is concerned. We agree.

Because the statute mentions appellate review of a trial court *order*, but goes on to require a bond when a local agency appeals a *judgment*, Kalnel contends that the statute requires a writ petition only when interlocutory relief is sought from a trial court order in an action under the HAA. The legislative history of the HAA leads us to reject this contention.

As originally introduced, and as first amended, section 65589.5 did not mention the procedure for seeking appellate review in HAA actions. (Legis. Counsel's Dig., Sen. Bill No. 575 (2005-2006 Reg. Sess.).) Subdivision (m) was added as part of a June 7, 2005, amendment, and provided that, after a trial ended, "[u]pon entry of the trial court's order [*denying relief*], a party shall, in order to obtain appellate review of the order," file a writ petition within 20 days, with the trial court permitted to extend that period by up to 20 more days. If the local agency appealed the judgment, then the agency would have to post a bond. (Legis. Counsel's Dig., *supra*, at pp. 9-10, italics added.)

The only parties who can be denied relief in an HAA action are developers such as Kalnel who are challenging a local agency's disapproval of a proposed development. Appellate review of an order denying relief in such an action must therefore refer to a trial court judgment in favor of the local agency whose decision has been challenged, not to some unspecified interlocutory order.

SB 575 amended subdivision (m) to its current form on June 16, 2005, by deleting the limiting phrase "denying relief" from the mandatory writ procedure. Just as amendments to existing legislation are indicative of legislative intent to broaden or restrict the scope of a statute (*Lockheed Martin Corp. v. Workers' Comp. Appeals Board* (2002) 96 Cal.App.4th 1237, 1245), so too is the evolution of proposed legislation from its introduction to its final form. (*Quarterman v. Kefauver* (1997) 55 Cal.App.4th 1366, 1373.) Instead of requiring a writ petition by only a party denied relief in an HAA action – which must mean developers – the Legislature must have intended to expand the writ requirement to all parties in HAA actions.

10

Our conclusion is bolstered by the Legislative's Counsel Digest, which is the official summary of the legal effect of a bill and is relied upon by the Legislature throughout the legislative process. (*Joannou, supra,* 219 Cal.App.4th at p. 759.) Although it is not binding, the digest is entitled to great weight. (*Ibid.*) In describing every version of SB 575 from the time subdivision (m) was first added and then amended to delete the "denying relief" language, the digest stated that the bill would "specify procedures for appeal of the court's *order*." (Legis. Counsel's Dig., *supra*, italics added.) It appears to us that the Legislature: (1) loosely interchanged the term "appeal" as an alternative for appellate review by way of writ proceedings; and (2) intended "order" to mean the final judgment in an HAA action. In other words, the final order in an HAA action was not an appealable judgment or order under Code of Civil Procedure section 904.1.

The City also contends that the HAA writ review provision is substantially similar to the California Public Records Act. (§ 6250, et seq.) The losing party in a Public Records Act case must also file a writ petition within 20 days of the trial court's order (§ 6259, subd. (c).) Under that provision, the failure to do so divests the appellate court of jurisdiction, a defect that cannot be remedied by treating a notice of appeal as a writ petition if the notice of appeal was filed after the 20-day writ petition deadline. (*MinCal Consumer Law Group v. Carlsbad Police Dept.* (2013) 214 Cal.App.4th 259, 265.)

As Kalnel points out, however, section 6259, subdivision (c) expressly states that an order of the court in a Public Records Act case "is not a final judgment or order within the meaning of Section 904.1 of the Code of Civil Procedure from which an appeal may be taken, but shall be immediately reviewable by petition to the appellate court for the issuance of an extraordinary writ" within 20 days after notice of entry of order is served. Because the HAA contains no such express limitation on the right to appeal, Kalnel contends that judgments in HAA actions are as appealable as any other final judgment.

We agree that the requirement to seek writ relief as the only avenue of appellate review in HAA actions would have been clearer if the Legislature had chosen the same express limiting language found in the Public Records Act. Even so, in light of the

11

legislative history of section 65589.5, subdivision (m), we see no other reasonable construction of the statement that a party to an HAA action must file a writ petition within 20 days of service of notice of entry of the adverse order "in order to obtain appellate review." We therefore dismiss Kalnel's appeal of the HAA order even though it is part of a final judgment.[8]

### 4.      *The Density Bonus Act Is Subordinate to the Coastal Act*

The Density Bonus Act (§ 65915) states:  "Nothing in this section shall be construed to supersede or in any way alter or lessen the effect or application of the [Coastal Act]."  (§ 65915, subd. (m).)  As the City observes, this language is a clear expression of legislative intent that the Density Bonus Act is subordinate to the Coastal Act.

Kalnel disagrees, relying on a provision of the Density Bonus Act stating that the grant of a density bonus or concession "shall not be interpreted, in and of itself, to require . . . a local coastal plan amendment."  (§ 65915, subds. (f)(5), (j).)

The language of subdivision (m) could not be clearer:  the Density Bonus Act does not supersede the Coastal Act or in any way alter or lessen its effect.  The plain language of the provision therefore governs.  (*Drouet v. Superior Court* (2003) 31 Cal.4th 583, 593.)  That the mere grant of a density bonus or concession does not require a coastal plan amendment does not raise a conflict with, or create an ambiguity in, the plain meaning of subdivision (m) or otherwise suggest that the Coastal Act takes a back seat to the Density Bonus Act.

Kalnel also contends that other legislative provisions declaring the vital importance of encouraging affordable housing somehow alter the plain meaning of section 65915, subdivision (m).  (§§ 65580, subd. (a) [housing availability to persons of

---

[8]      We note that in *Honchariw v. County of Stanislaus* (2011) 200 Cal.App.4th 1066, which the parties cite for other purposes, the Court of Appeal reviewed the judgment in an HAA action by way of appeal.  However, the issue of appealability versus writ review was not mentioned in that decision, and it is therefore not authority for the proposition that HAA final orders are appealable.

all economic means is priority of highest order]; 65589.5, subd. (g) [lack of affordable housing is a critical statewide problem].) We disagree.

First, we are construing the Density Bonus Act (Gov. Code, § 65915), not those other provisions, and, as just discussed, under that law the Coastal Act takes precedence. Second, the Coastal Act seems to strike a balanced pose between the policies of affordable housing and coastal protection, stating only that it is "important . . . to encourage the protection of existing and the provision of new affordable housing" within the coastal zone. (Pub. Resources Code, § 30604, subd. (g).) As a result, under that provision, density bonuses granted under the HAA (Gov. Code, § 65985.5) or the Density Bonus Act (Gov. Code, § 65915) may be denied if the local agency issuing a coastal development permit finds that the project "cannot feasibly be accommodated on the site in a manner that is in conformity with" the Coastal Act. (Pub. Resources Code, § 30604, subd. (f).) We find this consistent with the Coastal Act's statement that protecting coastal resources is a "paramount concern" because those resources are of "vital and enduring interest." (Pub. Resources Code, § 30001, subds. (a), (d).)

In short, the Legislature appears to have struck a balance between the Coastal Act and the Density Bonus Act by requiring local agencies to grant density bonuses unless doing so would violate the Coastal Act. We therefore hold that section 65915 is subordinate to the Coastal Act and that a project that violates the Coastal Act as the result of a density bonus may be denied on that basis.[9]

5.     *The Mello Act Is Also Subordinate to the Coastal Act*

Determining the relationship between the Mello Act and the Coastal Act is not as clear cut a task. Unlike the Density Bonus Act (Gov. Code, § 65915), the Mello Act does not state that the Coastal Act supersedes it. Instead, the Mello Act states that it "shall apply within the coastal zone as defined by the Coastal Act." (Gov. Code, § 65590, subd. (a).) The Coastal Act also provides that "[n]othing in this division shall exempt

---

[9]     Because the HAA similarly provides that it shall not be construed to relieve local agencies from complying with the Coastal Act (§ 65589.5, subd. (e)), if we were to reach that issue we would likely conclude that it too was subordinate to the Coastal Act.

local governments from meeting the requirements of state and federal law with respect to providing low- and moderate-income housing, replacement housing, relocation benefits, or any other obligation related to housing imposed by existing law or any law hereafter enacted." (Pub. Resources Code, § 30007.)

Standing alone, these two provisions might be construed as giving the Mello Act primacy over the Coastal Act. However, the Coastal Act also requires that the design of new developments protect scenic views and be "visually compatible with the character of the surrounding areas." (Pub. Resources Code, § 30251.) That was the basis of the City's decision to reject the Kalnel project, and on appeal Kalnel does not contend there was insufficient evidence to support that finding.

In the face of an undisputed Coastal Act violation, does Public Resources Code section 30007 require that the City stand down from enforcing the Coastal Act in order to comply with the Mello Act?

We begin with the Mello Act itself, which states only that it "shall apply" in the coastal zone. Under Kalnel's interpretation, the Mello Act supersedes the Coastal Act, requiring approval of increased density affordable housing developments even if they violate Coastal Act provisions. However, the Legislature knows how to expressly state that one statute supersedes another, but did not do so here. In the absence of such an express declaration of legislative intent, we will not presume that the Legislature intended to do so if we can harmonize the Mello Act with the Coastal Act. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, 18; *Sacramento Newspaper Guild v. Sacramento County Board of Supervisors* (1968) 263 Cal.App.2d 41, 54-55.) As set forth below, we conclude they can be harmonized.

We next turn to Public Resources Code section 30007.5, where the Legislature has provided interpretive guidance in reconciling conflicting Coastal Act Provisions: "The Legislature further finds and recognizes that conflicts may occur between one or more policies of this division. The Legislature therefore declares that in carrying out the provisions of this division such conflicts be resolved in a manner which on balance is the most protective of significant coastal resources. In this context, the Legislature declares

14

that broad policies which, for example, serve to concentrate development in close proximity to urban and employment centers may be more protective, overall, than specific wildlife habitat and other similar resource policies." (Pub. Resources Code, § 30007.5.) The Coastal Act must "be liberally construed to accomplish its purposes and objectives." (Pub. Resources Code, § 30009.)

As discussed above, the Coastal Act states that although affordable housing is encouraged within the coastal zone, density bonuses may be reduced if the increased density is incompatible with the Coastal Act. (Pub. Resources Code, § 30604, subd. (f).) As we read it, this provision subordinates affordable housing density bonuses to the Coastal Act, in apparent contradiction to Public Resources Code section 30007. We must resolve that conflict in the manner that is most protective of coastal resources, and do so through a liberal construction that will accomplish the Coastal Act's purpose and objectives. (Pub. Resources Code, §§ 30007.5, 30009.)

As also noted above, this case involves an undisputed violation of Public Resources Code section 30251, which requires development design that protects scenic views and is "visually compatible with the character of the surrounding areas." The Coastal Act contains several other directives that could also clash with the Mello Act: preventing intrusion into environmentally sensitive areas (Pub. Resources Code, § 30240); maintaining public access to the coast (Pub. Resources Code, § 30252); and in the case of new development, protecting special communities and neighborhoods with unique characteristics that are popular visitor destination points for recreational uses (Pub. Resources Code, § 30253, subd. (e)).[10]

Which interpretation is most protective of coastal resources? One that requires Mello Act housing even if it blocks coastal access, intrudes into environmentally sensitive areas, or is visually incompatible with existing uses, or one that requires application of the Mello Act's affordable housing requirements within the coastal zone so long as those housing projects abide by the Coastal Act's overall protective provisions?

---

[10] Although the City did not rely on the latter provision, it seems applicable here.

15

Remembering the Legislature's statements that protecting coastal resources is a paramount concern because those resources are of vital and enduring interest, it seems clear that the latter interpretation must prevail. We therefore conclude that Kalnel's project was still subject to the Coastal Act despite its compliance with the Mello Act. Accordingly, the City properly rejected the project pursuant to Public Resources Code section 30251.[11]

6.      *The City Was Not Required to Make Findings that the Project Could Not Be*
        *Feasibly Accommodated Under the Coastal Act*

Kalnel contends that, even if the Coastal Act takes precedence and its project was incompatible with the surrounding community, the City violated the Coastal Act by not finding that the project could not be accommodated on the site in conformity with that act. (Pub. Resources Code, § 30604, subd. (f).)

The trial court rejected that contention, concluding that Public Resources Code section 30604, subdivision (f) applied only where the density of a development had been reduced, not where, as here, an entire project was rejected based on subjective aesthetic considerations that violated the Coastal Act. We agree.

Subdivision (f) states that the agency in charge of issuing a coastal development permit "may not require measures that reduce residential densities below the density sought by the applicant if the density sought is within the permitted density or range of density established by local zoning plus the additional density permitted under [section 65915], unless the issuing agency . . . makes a finding, based on substantial evidence in the record, that the density sought by the applicant cannot feasibly be accommodated on the site in a manner that is in conformity with [the Coastal Act] or the certified local coastal program."

---

[11]     At oral argument, counsel for Kalnel contended that our decision would mean that the housing density statutes do not apply in the coastal zone. We disagree. While those statutes do apply in the coastal zone, we hold only that they may still be superseded by the Coastal Act. While we recognize the importance of encouraging affordable housing, it is for the Legislature to strike the balance between that policy and the Coastal Act.

16

Kalnel contends this provision applies because the City's conduct was the ultimate density reduction of disapproving the entire project. As City Planning Commissioner Donovan stated during the appeal hearing before that agency, the issue was visual compatibility under the Coastal Act, not density. We do not believe the City would have had to make the feasibility findings had it rejected the project because it cut off coastal access or intruded into an environmentally sensitive area. In such a case density would not have been the issue and no density reduction would have been ordered. The same reasoning applies here where the City denied the project because it was visually incompatible and otherwise out of step with the surrounding community. Accordingly, the City was not required to make the feasibility findings required by Public Resources Code section 30604, subdivision (f).

7.     *The City Did Not Violate the Venice Land Use Plan*

In 2001 the Coastal Commission certified the City's Venice Land Use Plan (VLUP), which is the local coastal program governing the City's issuance of coastal development permits. (Pub. Resources Code, § 30600.5, subd. (c).) Under that provision, the City shall issue a permit if it finds that the proposed development conforms to the VLUP. (*Ibid.*) The trial court found that the Kalnel project met the standards of the VLUP, leading Kalnel to contend that the City violated both the VLUP and the Coastal Act.

Kalnel supports this contention by pointing to provisions of the VLUP that: (1) grant additional density and height bonuses for housing projects located in multiple housing areas near Venice Boulevard, which would include the area around the proposed Kalnel project (VLUP Policies I.A.13.b&e; V.A.2); and (2) require the City to identify all feasible means of accommodating a density increase, implement the means most protective of coastal resources, and, if it finds that all feasible incentives would have an adverse impact, to grant the incentive that is most protective of coastal resources (VLUP Policies 1.A.13.c.&e).

The City contends that Public Resources Code section 30600.5 is not applicable because the City did not find that Kalnel's project was compatible with the VLUP. We

17

agree. A predicate to the applicability of that section is a finding by the local agency that the proposed development conforms to its local coastal plan. The City overturned the earlier decisions of its planning officials concerning compliance and was therefore not compelled to issue the coastal development permit under Public Resources Code section 30600.5.

As for the trial court's apparent finding that the Kalnel project complied with the VLUP, we make two observations. First, the finding is ambiguous to the extent the trial court also found that the project violated the Coastal Act. Second, because we exercise independent review, we are not bound by the trial court's findings, and will instead determine for ourselves whether the City acted properly. As set forth below, we conclude that the City's actions were consistent with the VLUP.

The City contends that its decision was consistent with the VLUP, pointing to provisions: (1) stating that building heights and bulks shall be controlled to preserve the nature and character of existing neighborhoods (VLUP Policy I.A.1.a); (2) call for the preservation of "stable single-family residential neighborhoods" and promote new developments that are compatible with those neighborhoods (VLUP Policy I.A.2); and (3) require yards in the Kalnel project area to accommodate the need for fire safety, open space, storm water percolation, and on-site recreation consistent with the existing scale and character of the neighborhood[12] (VLUP Policy I.A.7).

While those VLUP policies tend to support the City's position, they are not conclusive. More persuasive to us are the following portions of the VLUP: (1) a summary of Venice coastal issues under the heading, "**Preservation of Venice as a Special Coastal Community**," listing the goals of "Preservation of community character, scale and architectural diversity[,] [¶] "Development of appropriate height, density, buffer and setback standards."; and (2) a policy statement that the VLUP was intended to address various coastal act policies, including Public Resources Code section 30251,

---

[12] The City also contends that this issue was waived because Kalnel did not raise VLUP compliance at trial. We disagree. The project's compliance with VLUP was mentioned in the petition and argued in Kalnel's trial court points and authorities.

18

which calls for development that is visually compatible with the character of surrounding areas.

As we see it, the VLUP was expressly designed to protect the visual and scenic compatibility requirements of the Coastal Act that were the basis for the City's rejection of Kalnel's project. At best, the handful of height and density policies cited by Kalnel set up a conflict with those policies. However, a closer examination of the height and density policies upon which Kalnel relies shows that they are inapplicable here.

Although VLUP policies I.A.13.b,c and e do call for the application of density bonuses in accordance with the Density Bonus Act (§ 65915), those policies fall within the subject heading "**Replacement of Affordable Housing**." The first policy in that section is also captioned "**Replacement of Affordable Housing**," and states that it applies "[p]er the provisions of . . . the 'Mello Act' [in regard to] the conversion or demolition of existing residential units occupied by [low income residents]. It prohibits the conversion or demolition of such existing units unless they are replaced in accordance with the Mello Act." The section goes on to address issues such as the location of replacement housing (VLUP Policy I.A.10), the ratio of replacement units (VLUP Policy I.A.11), and the right of displaced low income residents to priority for the replacement units (VLUP Policy I.A.13). The density and height bonus requirements that Kalnel relies upon follow as part of the same section.

As discussed earlier, the Mello Act applies in two situations: (1) when existing low income units are demolished, they must be replaced with new ones; and (2) when new developments include low income housing, density bonuses apply unless the increased density conflicts with the Coastal Act. The density and height bonus policies that Kalnel relies on are expressly geared toward the former circumstance, where existing low-income units are demolished. This case involves a new development, however, and is not covered by those policies.

Even if those policies do apply to proposed new developments that include affordable housing, they do not assist Kalnel. According to Kalnel, under VLUP Policy I.A.13.c, the City was obligated to not only permit the increased density and

19

accompanying height incentives, but to identify all feasible means of accommodating the increased density if the City found that the project would have an adverse effect on coastal resources. Based on this, Kalnel contends the City violated the VLUP by failing to approve the project and by failing to identify ways in which Kalnel's project might be feasibly accommodated.

Read in its entirety, this provision states that any housing development approved under the Density Bonus Law "shall be consistent, to the maximum extent feasible and in a manner most protective of coastal resources, with all otherwise applicable certified local coastal program policies and development standards." (VLUP Policy I.A.13.c.) After describing what steps the City must take if a proposed project is consistent with the local coastal policies, the provision addresses the City's obligations if it finds "that the means for accommodating the density increase . . . will have an adverse effect on coastal resources . . . ." In such a case, "the City shall identify all feasible means of accommodating the 25 percent density increase and consider the effects of such means on coastal resources. The City shall require implementation of the means that are most protective of coastal resources." (*Ibid.*) "Coastal resources" is defined to mean "public access, marine and other aquatic resources, environmentally sensitive habitat, *and the visual quality of coastal areas.*" (VLUP Policy I.A.13.f, italics added.)

As we read it, this policy affirms the significance of Coastal Act compliance when approving projects with affordable housing density bonuses, including the provision concerning visual conformity with the surrounding area. Most important, however, is the policy's limited applicability to decisions based on the effect of a density bonus on Coastal Act compliance. In other words, the City's accommodation obligation applies only when it determines that a project's increased density causes a conflict with the Coastal Act. As mentioned previously, that is not what occurred here. Instead, the project was disapproved for purely aesthetic reasons unrelated to its density, making

20

VLUP Policy I.A.13.c. inapplicable.[13] As the City points out, under Kalnel's reasoning the City was obligated to propose architectural design changes to the proposed project, a task beyond the reach of planning commissioners or City Council members.

Finally, as the City points out, Kalnel's reliance on VLUP Policy V.A.2 has no apparent application here because that policy addresses street improvements, including taking into account additional density considerations for affordable housing. That policy has no effect on whether or not a project should be approved in the first instance or otherwise complies with the Coastal Act. We therefore conclude that the City complied with the VLUP.

## DISPOSITION

The judgment is affirmed. The City of Los Angeles shall recover its costs on appeal.


RUBIN, J.

WE CONCUR:



BIGELOW, P. J.



GRIMES, J.

---

[13] As counsel for the City conceded at oral argument, Kalnel is free to seek approval of a redesigned project at the same density so long as its visual qualities are compatible with the surrounding neighborhood.

21