Filed 9/10/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CALIFORNIA RENTERS LEGAL ADVOCACY AND EDUCATION FUND et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF SAN MATEO et al., <br><br> Defendants and Respondents; <br><br> TONY MEHMET GUNDOGDU et al., <br><br> Real Parties in Interest; <br><br> ROB BONTA, as Attorney General, etc., <br><br> Intervener and Respondent. | A159320, A159658 <br><br> (San Mateo County Super. Ct. No. 18-CIV-02105) |

"California has a housing supply and affordability crisis of historic proportions." (Gov. Code, § 65589.5, subd. (a)(2)(A).)[1] This "despite the fact that, for decades, the Legislature has enacted numerous statutes intended to significantly increase the approval, development, and affordability of housing for all income levels." (§ 65589.5, subd. (a)(2)(J).) Among these statutes is the Housing Accountability Act (HAA) (Gov. Code, § 65589.5), enacted in 1982 with the goal of "meaningfully and effectively curbing the capability of

---

[1] All undesignated statutory references are to the Government Code.

local governments to deny, reduce the density for, or render infeasible housing development projects." (§ 65589.5, subd. (a)(2)(K).) In this, the HAA has historically failed. (*Ibid.*)

These were the findings of the Legislature in 2017, when it amended the HAA to strengthen the statute. (Stats. 2017, ch. 378, § 1.5.) In relevant part, the HAA restricts the ability of local governments to deny an application to build housing if the proposed project complies with general plan, zoning, and design review standards that are "objective." (§ 65589.5, subd. (j)(1).) A 2017 amendment adds teeth to this restriction by defining what it means to comply with such standards: a housing development project is deemed to comply if "substantial evidence . . . would allow a reasonable person to conclude" that it does. (§ 65589.5, subd. (f)(4) (subdivision (f)(4)).) This case raises questions about how to apply the HAA as amended and whether the statute, especially subdivision (f)(4), violates the California Constitution.

After the City of San Mateo (the City) denied an application to build a ten-unit apartment building, petitioners California Renters Legal Advocacy and Education Fund, Victoria Fierce, and John Moon (collectively, CARLA) sought a writ of administrative mandamus seeking to compel the project's approval.[2] The trial court denied the petition, ruling that the project did not satisfy the City's design guidelines for multifamily homes and that, to the extent the HAA required the City to ignore its own guidelines, it was an unconstitutional infringement on the City's right to home rule and an unconstitutional delegation of municipal powers.

---

[2] The petition was also brought on behalf of San Francisco Bay Area Renters Association, which is not a party to this appeal.

We conclude otherwise. The design guideline the City invoked as part of its reason for rejecting this housing development is not "objective" for purposes of the HAA, and so cannot support the City's decision to reject the project. And because the HAA checks municipal authority only as necessary to further the statewide interest in new housing development, the HAA does not infringe on the City's right to home rule. Rejecting the City's other constitutional arguments as well, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Tony Gundogdu submitted an application to build a four-story, ten-unit multifamily residential building (the building or the project) in San Mateo in 2015. As proposed, the building would stretch the length of a block on North El Camino Real, bounded by El Camino Real on the east, West Santa Inez Avenue at the south, and Engle Road at the north. West Santa Inez Avenue and Engle Road are both in residential neighborhoods of single-family houses. Immediately to the west of the project are a two-story house on West Santa Inez Avenue and a single-story house on Engle Road. The project site is designated in the City's general plan—and zoned—for high-density multifamily dwellings, "R4" Zoning.

Staff to the City's Planning Commission (the Commission) reviewed Gundogdu's application and, after securing minor changes to the proposal, concluded it was consistent with the City's general plan and its Multi-Family Design Guidelines (the Guidelines). Staff recommended the Commission approve the project. They reported that "[v]ariations in the roof forms help to create a transition" between the building and the single-family homes to the north and west, and that "[p]roposed landscaping helps to soften the structure and provide buffers to the adjacent single-family residences." Alterations made at the behest of Commission staff included adding trellises

3

to facades "to create more articulation and add horizontal elements," thus "reduc[ing] the appearance of height."

The application came before the Commission in August 2017. At the hearing, a number of City residents opposed the project, on grounds including concerns that it was out of scale with the adjacent single-family residential area. The Commission continued the hearing. Before the next hearing, planning staff again recommended approval, subject to revised conditions. The staff again proposed the Commission find the project is "in scale and harmonious with the character of the neighborhood" and "meets all applicable standards," including that it "complies with the City's Multi-Family Dwelling Design Guidelines."

On September 26, 2017, commissioners nonetheless expressed concern that the proposed building was out of scale with the houses in the neighborhood, and the Commission voted to disapprove the project, directing staff to prepare findings for denial. So directed, the staff next proposed findings that the project is "<u>not</u> in scale and . . . <u>not</u> harmonious with the character of the neighborhood." The building is "too tall," "too large and bulky for the subject site due to [its] four-story height," and "not in keeping with the smaller one and two story dwellings in the area." Key to this case, the proposed findings noted that on the Engle Road side there is a two-story differential between the project and adjacent single-family dwellings (ignoring the fourth story, which is stepped back). Thus, "[t]he project is not in substantial compliance with" the Guidelines' limitations on building scale, which direct that if there is more than a one-story variation in height between adjacent buildings, "a transition or step in height is necessary," including that a project should "step back upper floors to ease the transition."

4

Adopting these proposed findings in full, the Commission denied the project without prejudice on October 10, 2017. The City Council considered the appeal on February 5, 2018, and upheld the Commission's decision, also denying the application without prejudice. Appellants then brought this action seeking a writ of administrative mandamus (Code Civ. Proc., § 1094.5) on the ground the denial violated the HAA.

The trial court denied the petition. Before doing so, the court asked the parties for additional briefing on a number of issues, including the following: "If either party contends that some aspect of [subdivision] (f)(4) is or is not enforceable or is or is not applicable to this action, the parties are ordered to provide all authority supporting that contention." In response, the City argued that the HAA's subdivision (f)(4) violates the California Constitution by infringing on the City's right to "home rule"—or control of its own municipal affairs as a charter city—and by unlawfully delegating municipal functions to private parties, and that subdivision (f)(4) raises due process concerns because it deprives neighboring landowners of a meaningful hearing. CARLA did not address these issues, either in its briefing or at the hearing on the petition.

The trial court in its ruling found that the City's Guidelines were " 'applicable, objective' " standards for purposes of the HAA and that the project did not satisfy the Guidelines, and accordingly stated it would deny the petition for writ of mandate. Despite reaching this seemingly dispositive result, the court went on to conclude that, to the extent the HAA conflicted with "otherwise enforceable portions of the city's Municipal Code regarding review of housing development projects," it was unenforceable as an impermissible intrusion into the City's municipal affairs under the home rule doctrine of the California Constitution (Cal. Const., art. XI, § 5(a)) and

5

violated the prohibition on delegation of municipal affairs to private parties (Cal. Const., art. XI, § 11(a)). With these sweeping conclusions, the court had no occasion to reach the City's due process argument.

The court later denied CARLA's motion for a new trial, and this timely appeal ensued. Before this court, CARLA defends the constitutionality of the HAA and argues the project meets all applicable standards. Intervening, the Attorney General argues that the HAA is constitutional and that the trial court erred in deferring to the City's interpretation of its Guidelines. (See Code Civ. Proc., §§ 664.5, subd. (e), 902.1.) The City urges us to affirm the trial court's judgment without reaching the constitutional issues, but also contends that CARLA's interpretation of the HAA violates the California Constitution. And numerous amici have weighed in with helpful briefs.[3]

## DISCUSSION

Because it is fundamental, we begin with a careful examination of the HAA as it operates and has evolved in the context of California's system for approving new housing development. We then address whether the City's denial of this project application violates the HAA; if, as the City urges, we answer that question in the negative, we need not reach the constitutional issues. (See *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 66 [courts do not decide constitutional issues unnecessarily].) Because we

---

[3] In support of appellants are the Building Industry Association-Bay Area, the San Francisco Bay Area Planning and Urban Research Association, Bay Area Council, and Housing Action Coalition; Californians for Homeownership and the California Association of Realtors®; Habitat for Humanity Greater San Francisco, Inc.; and law professors Christopher S. Elmendorf, Michelle Wilder Anderson, Anika Singh Lemar, Dave Owen, Darien Shanske, and Kenneth Stahl. In support of respondents are the League of California Cities and the California State Association of Counties.

6

conclude that the City's decision did violate the HAA, we go on to address the constitutionality of, and uphold, the statute.

## I. The Housing Accountability Act

More than 50 years ago, the Legislature enacted a broad measure requiring counties and cities to " 'adopt a comprehensive, long-term general plan for the physical development of the county or city,' " with a housing element designed to promote adequate housing for the community. (*California Building Industry Assn. v. City of San* Jose (2015) 61 Cal.4th 435, 444 (*San Jose*), quoting Gov. Code., § 65300 et seq., enacted by Stats. 1965, ch. 1880, § 5.) The Legislature went further in 1980 with the Housing Element Law, which "set forth in considerable detail a municipality's obligations to analyze and quantify the . . . locality's share of the regional housing need as determined by the applicable regional ' "[c]ouncil of governments" ' (Gov. Code., § 65582, subd. (b)), and to adopt and to submit to California's Department of Housing and Community Development a multiyear schedule of actions the local government is undertaking to meet these needs. (*Id.*, §§ 65583–65588.)" (*San Jose*, at p. 445; see Elmendorf, *Beyond the Double Veto: Housing Plans as Preemptive Intergovernmental Compacts* (2019) 71 Hastings L.J. 79, 100–103.) Local governments prepare housing elements, but the state's Department of Housing and Community Development must approve them. (*San Jose*, at p. 445.)

Since 1980, local governments have failed to approve, and developers have failed to build, housing in quantities approximating regional housing needs. As an example, a report of the Civil Grand Jury of Santa Clara County shows that of 16 jurisdictions in the county, fewer than half met their regional housing needs assessment between 2007 and 2014. (Civil Grand Jury of Santa Clara County, Affordable Housing Crisis: Density is our

7

Destiny (June 2018), p. 7.) And the California Department of Housing and Community Development reported in 2018 that for the previous ten years, California had averaged fewer than 80,000 new homes permitted annually— less than half the projected need for 180,000 homes a year. (Dept. of Housing and Community Development, California's Housing Future: Challenges and Opportunities, Final Statewide Housing Assessment 2025 (Feb. 2018) p. 5.) A report from the California Legislative Analyst's Office found a similar shortfall for the entire period of 1980 to 2010, and attributed it in part to community resistance to new housing, facilitated by laws allowing cities and counties to control when and where development occurs. (Legislative Analyst's Office, California's High Housing Costs: Causes and Consequences (Mar. 2015) pp. 15, 21.)

Against this backdrop, the Legislature enacted in 1982 the HAA, colloquially known as the "Anti-NIMBY" (Not-In-My-Back-Yard) law, and it has amended the statute repeatedly in an increasing effort to compel local governments to approve more housing. (§ 65589.5, subd. (a); *Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 295–297 (*Ruegg*); *Honchariw v. County of Stanislaus* (2011) 200 Cal.App.4th 1066, 1068 (*Honchariw*).) As originally enacted—and still generally today—the HAA provides that when a proposed housing development complies with applicable general plan, zoning, and development policies, the local agency may disapprove the project (or approve it on condition that it be developed at lower density) only if the local agency finds that the project would have a specific, adverse, and unavoidable impact on public health or safety. (Stats. 1982, ch. 1438, § 2; *Honchariw*, at pp. 1074–1075; § 65589.5, subd. (j)(1).)

Ensuing amendments to the HAA have sought to serve and clarify the Legislature's intent. In 1990, the Legislature made the HAA expressly

applicable to charter cities.  (Former § 65589.5, subds. (a)(1) & (2), (g); Stats. 1990, ch. 1439, § 1.)  In 1999, the Legislature amended the operative language of subdivision (j) to narrow the kinds of policies that could be invoked to defeat an application, adding the italicized words:  "When a proposed housing development project complies with applicable, *objective* general plan and zoning *standards and criteria,*" the project cannot be denied or reduced in density without the specified health and safety findings.  (Stats. 1999, ch. 968, § 6, italics added.)  A 2002 amendment clarified that the phrase "general plan and zoning standards and criteria" includes "design review standards."  (Stats. 2002, ch. 1721, § 1.)  And a 2005 amendment authorized fines if a local agency denied a project in bad faith.  (Former § 655589.5, subd. (*l*); Stats. 2005, ch. 601, § 1.)

In 2016, the Legislature added an enhanced standing provision, allowing not only a person eligible for residency in a development but also a housing organization to bring an action to challenge a local agency's disapproval of a housing development.  (Former § 655589.5, subd. (k)(1) & (2), Stats. 2016, ch. 420, § 1.)

Still dissatisfied with the dearth of housing in this state, the Legislature in 2017 passed further amendments to the HAA, supported by detailed findings.  The Legislature added a provision requiring that an applicant receive timely written notice and an explanation if an agency considers a proposed housing development inconsistent with applicable standards.  (§ 65589.5, subd. (j)(1); Stats. 2017, ch. 378, § 1.5.)  It heightened fines for bad faith disapproval of a project.  (§ 65589.5, subd. (*l*); Stats. 2017, ch. 378, § 1.5.)  And it increased the burden of proof required for a finding of adverse effect on public health or safety.  (§ 655589.5, subd. (j)(1); Stats. 2017, ch. 378, § 1.5.)

9

Most importantly for our purposes, the Legislature added subdivision (f)(4), which provides, "For purposes of this section, a housing development project . . . shall be deemed consistent, compliant, and in conformity with an applicable plan, program, policy, ordinance, standard, requirement, or other similar provision if there is substantial evidence that would allow a reasonable person to conclude that the housing development project . . . is consistent, compliant, and in conformity." (Stats. 2017, ch. 378, § 1.5.)

Finally, the Legislature added this interpretative gloss on the statute: "It is the policy of the state that [the HAA] should be interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, housing." (§ 65589.5, subd. (a)(2)(L), Stats. 2017, ch. 378, § 1.5.)

In this case, the City made no findings regarding an adverse impact on public health or safety, and no party contends this portion of the statute is relevant to our analysis. Also not at issue are separate provisions of the HAA addressing below-market-rate housing and emergency shelters. (See, e.g., § 65589.5, subds. (d), (h)(3), (k)(1)(A)(ii).) The key provision for our review is subdivision (j), which now provides that in the absence of health and safety findings a local agency may not disapprove or reduce the density of a proposed housing development that "complies with applicable, objective general plan, zoning, and subdivision standards and criteria, including design review standards, in effect at the time that the application was deemed complete." (§ 65589.5, subd. (j)(1).)

## II. The City's Rejection of the Project Violated the HAA

### A. Standard of Review

CARLA brings this petition for administrative mandamus under Code of Civil Procedure section 1094.5, seeking to enforce the HAA. (See

§ 65589.5, subd. (m).)  Our task is therefore to determine whether the City "proceeded in the manner required by law," with a decision supported by the findings, and findings supported by the evidence; if not, the City abused its discretion.  (Code Civ. Proc., § 1094.5, subd. (b); *Honchariw, supra,* 200 Cal.App.4th at p. 1072.)

To the extent our decision rests on factual issues, our scope of review is identical to that of the trial court.  We examine the findings of the public entity itself and the relevant materials in the administrative record to determine whether the decision should be upheld, reviewing the City's action, and not the trial court's decision.  (See *Kalnel Gardens, LLC v. City of Los Angeles* (2016) 3 Cal.App.5th 927, 937–938.)  However, instead of asking, as is common in administrative mandamus actions, "whether the City's findings are supported by substantial evidence" (*ibid.*), we inquire whether there is "substantial evidence that would allow a reasonable person to conclude that the housing development project" complies with pertinent standards. (§ 655589.5, subd. (f)(4).)  As the public entity that disapproved the project, the City bears the burden of proof that its decision conformed to the HAA. (§ 65589.6.)

Questions of law, including the proper interpretation of a statute, we review independently, although we may take into account an agency's interpretation of its own rules in appropriate circumstances.  (*Yamaha Corp. of America v. State Bd. Of Equalization* (1998) 19 Cal.4th 1, 8 (*Yamaha*).) Where the constitutionality of a statute is challenged, we bear in mind that "a statute, once duly enacted, 'is presumed to be constitutional,' " such that any " '[u]nconstitutionality must be clearly shown.' "  (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1086.)

11

## B. General Plan and Multifamily Design Guidelines

One of the goals enumerated in the housing element of the City's general plan is to "[m]aintain the character and physical quality of residential neighborhoods." To that end, the housing element establishes a policy of "[r]eview[ing] development proposals for conformance to the City's multi-family design guidelines for sites located in areas that contain substantial numbers of single-family homes." "[N]ew multi-family projects in areas having a predominance of single-family residences should be of a scale and include design features which are compatible with surrounding single-family homes," the housing element directs, "while maintaining housing affordability as a major goal."

The urban design element of the general plan also notes that the City adopted the Guidelines because "the character of the neighborhood," including the scale of its buildings, is important in a residential area. To maintain and enhance the character of residential neighborhoods, the urban design element includes a policy to "[e]nsure that new multi-family developments substantially conform to the City's Multi-family and Small Lot Multi-family Design Guidelines. . . ."

The portion of the Guidelines with which the City found the project inconsistent addresses building scale. The Guidelines provide, under the topic "Height," as follows: "Most multi[-]family neighborhoods in San Mateo are 1 to 4 stories in height. When the changes in height are gradual, the scale is compatible and visually interesting. If height varies by more than 1 story between buildings, *a transition or step in height is necessary*. Any portion of a building constructed taller than surrounding structures should have the taller section built to a width that acknowledges the traditional building width pattern of the City—generally 30 to 50 feet in width." The

design objectives listed for this guideline are, "Avoid changes in building height greater than one story from adjacent structures. *If changes are greater, stepback upper floors to ease the transition*," and "Construct taller portions at traditional building widths, generally 30 to 50 feet wide." (Partial italics omitted.)

An accompanying illustration shows an appropriate design in which "[u]pper floors of the multi[-]family building are stepped[ ]back where adjacent to an existing building that is two stories lower." In that illustration, no adjacent portion of the larger building is more than one story higher than the smaller existing building. An illustration of an inappropriate design shows a two-story house next to a box-like four-story multifamily building.

## C. Application of the HAA

The pivotal question in our application of the HAA is whether the Guidelines qualify as "applicable, objective general plan, zoning, and subdivision standards and criteria, including design review standards," which would allow the City to disapprove the project if they are not satisfied. (§ 65589.5, subd. (j)(1).) As to the portion of the Guidelines that addresses height, we conclude the Guidelines do not qualify as objective for purposes of the HAA.

As an initial matter, the parties disagree on the standard of review. The City urges that the issue be treated as one of law, subject to our de novo review as an issue of statutory interpretation but with deference to the City in interpreting its own rules. CARLA urges us to apply, to legal as well as factual issues, subdivision (f)(4)'s mandate that a project is deemed consistent with applicable standards if there is substantial evidence allowing a reasonable person so to conclude.

13

We model our answer on the decision of our colleagues in Division Two of this court in *Ruegg*. In construing a different statute intended also to restrict local authorities' ability to deny applications for new housing, they considered whether a project " 'would require the demolition of a historic structure that was placed on a national, state, or local historic register.' " (*Ruegg*, *supra*, 63 Cal.App.5th at p. 301, quoting § 65913.4, subd. (a)(7)(C).) This question, the *Ruegg* court concluded, had both a legal and a factual component: whether the type of object at issue, an ancient shellmound, was a " 'structure' " within the meaning of the statute was a question of statutory interpretation to be reviewed de novo; whether a shellmound existed on the project site was a question of fact. (*Ruegg*, at p. 301.)

Similarly here, we conclude that whether the height standards in the Guidelines are "applicable" and "objective" for purposes of the HAA is a question of law; whether the project is consistent with those standards is one of fact, to be evaluated under the standards of subdivision (f)(4). The questions of whether the height guidelines are "applicable" and "objective" require us to discern the meaning and legal effect of the HAA and the Guidelines, so they are questions of statutory interpretation we will review independently. (*Yamaha*, *supra*, 19 Cal.4th at p. 8.)

The first issue—applicability—is straight-forward. Relying on *Honchariw*, CARLA argues that to fall within the scope of section 65589.5 a standard must be *part of* a city's "general plan, zoning, and subdivision standards and criteria." (§ 65589.5, subd. (j); *Honchariw*, *supra*, 200 Cal.App.4th at p. 1077.) We are unpersuaded. The Guidelines, adopted in November 1994, recite that they are intended to implement multiple general plan policies, including a general plan directive to "[p]repare specific guidelines for multi[-]family development that address the preservation and

14

enhancement of neighborhood character," including by addressing "building scale." The applicable version of the City's general plan, mostly recently amended in 2015, specifically refers to the Guidelines in its housing and urban design elements, effectively incorporating them by reference. In the circumstances, we conclude the Guidelines fall within the scope of "general plan . . . standards and criteria, including design review standards." (§ 65589.5, subd. (j)(1).)

CARLA fares better with its second argument, that the Guidelines do not provide *objective* standards for purposes of the HAA. At the time of the events at issue here, the HAA did not define the term "objective," so we look to the ordinary meaning of that term. One dictionary defines "objective" as "expressing or dealing with facts or conditions as perceived without distortion by personal feelings, prejudices, or interpretations." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 799.) The definition added to the HAA effective January 1, 2020 is a longer version of the same idea. The HAA now defines "objective" as "involving no personal or subjective judgment by a public official and being uniformly verifiable by reference to an external and uniform benchmark or criterion available and knowable by both the development applicant or proponent and the public official." (§ 65589.5, subd. (h)(8), added Stats. 2019, ch. 665, § 3.1.) Using either of these definitions, a standard that cannot be applied without personal interpretation or subjective judgment is not "objective" under the HAA.

Further guidance is found in *Honchariw*, which looked at the Legislature's purpose in adding the word "objective" to the HAA. *Honchariw* explains that an amendment made in 1999 to subdivision (j) of section 65589.5, replacing an earlier reference to " 'applicable general plan, zoning, and development policies' " with " 'applicable, *objective* general plan and

15

zoning standards and criteria,' " "appears to have been intended to strengthen the law by taking away an agency's ability to use what might be called a 'subjective' development 'policy' (for example, 'suitability') to exempt a proposed housing development project from the reach of subdivision (j)." (*Honchariw*, *supra*, 200 Cal.App.4th at pp. 1076–1077.)  On their face, the Guidelines' provisions regarding the relative height of multifamily buildings and adjacent single-family houses are certainly less vague or subjective than a term such as "suitable."  But, in our view, they nevertheless require personal interpretation or subjective judgment that may vary from one situation to the next.

First, the language of the Guidelines is ambiguous as to whether a proposed building *must* incorporate a stepback in height when a project is taller than adjacent buildings.  The applicable portion of the Guidelines states that if height varies by more than one story between buildings, "a transition *or* step in height is necessary."  (Italics added.)  One reasonable reading of this language is that a transition that is something *other* than a step in building height may be acceptable.  Indeed, to read it otherwise would render the words "transition or" superfluous.

An interpretation that allows for a transition other than one accomplished by a step in height is consistent with the City's consultant's assessment—which planning staff appear originally to have shared—that trees between the project and the nearest house on Engle Road and a nearby street tree would "substantially mitigate [the] height differential."  The project calls for four large trees—each depicted as almost two stories tall—to run along the property line between the project and its nearest Engle Road neighbor.  Can large trees provide an adequate "transition or step in height"?  Answering this question not only allows, but requires, interpretation or

16

judgment. Under the planning staff's original interpretation of the Guidelines, the question is treated as one of design choice, which may be resolved in myriad ways depending on what form the designer views as most "compatible" with adjacent structures and "visually interesting."

A similar question arises with regard to trellises. The project includes, attached to the building along the Engle Road side, a trellis or arbor that looks to be about 10 feet wide and that creates a covered walkway alongside the building, next to the row of new trees. This trellis approximates the first floor in height, and a series of smaller trellises, each appearing to be two to three feet wide, also attaches to the building over windows at the level of the second story. Since these trellises are affixed to or abut the building's facade, perhaps the project's footprint includes the trellises, such that the building steps back from that footprint at the second and third floors on the Engle Road side. But if the trellises do not create a stepback, do they nonetheless create an adequate "transition"? Again, there is no clear answer to this interpretive question, and reasonable designers may disagree on the most satisfactory solution.

Second, to the extent the Guidelines do require a stepback in building height excluding trellises, the Guidelines offer no guidance on how extensive such a stepback must be. Where a stepback is required, it is unclear how far back upper floors of the building must step. In response to a question at oral argument, counsel for the City assessed a six-inch stepback of upper floors as sufficient for compliance with the Guidelines, although such a small setback would provide a less robust visual transition to the single-story home next door than would the much larger trellises and trees on which the project applicant relies. Also unclear is how far along a building's aspect a stepback must run. Is the City concerned primarily with street view, or should a

17

stepback run the length of the building?  The Guidelines do not address this issue.  Then there is the question of how many floors must be stepped back when a four-story project is adjacent to a single-story home.  On this question, the City itself has taken different positions during the course of this dispute.  The City Attorney who explained the stepback requirement to the City Council appears to have said that the Guidelines require *every* floor above the first to be stepped back along the Engle Road side, which is the position the City defended in its briefing in the trial court.  In this court, however, the City maintains that the Guidelines require the third and fourth floors—but not the second—to be stepped back.

The City is certainly capable of setting more specific standards, as the Guidelines themselves show.  The requirements for setbacks from property lines specify to the foot the required setbacks, and they further provide different setback standards where buildings are more than three stories in height, are adjacent to properties zoned R1 or R2, or are on specified blocks of El Camino Real.  There are even more detailed standards for setbacks from property lines and stepbacks in height in the Gateway area of the City; for instance, "South side of Third Avenue and Fourth Avenue:  Buildings shall be set back a minimum of 15' to a maximum of 20' from the Fourth Avenue property line for at least 60 % of the building frontage.  *Portions of the building over 30' [in] height shall be stepped back 8' minimum*."  (Italics added.)  Particularly relevant to this case is the specific height standard for R4 zoning at the project site, which according to a City staff report allows a maximum building height of 45 feet.  The building here tops out at 38 feet, demonstrably within that quantitative limit.

The Guidelines standard on height, by contrast, provides no such specificity, and on its face requires interpretation and subjective judgment.

18

This is no knock on the Guidelines.  They were adopted in 1994, before the HAA required objective criteria, when Guidelines could appropriately leave such ambiguities to the discretionary judgment of staff and elected officials. In the exercise of such discretion the City's planning staff and its experienced consultant originally concluded the project complied with the Guidelines; exercising *their* discretion, the Commission and City Council later determined that it did not.  The problem for the City is that since 1999, the HAA has required that a City rely only on objective, not discretionary, criteria in rejecting applications to build new housing.

The Legislature insists on objective criteria so as to ensure "reasonable certainty . . . to all stakeholders" about the constraints a municipality will impose.  (Assem., 3d reading analysis of Assem. Bill No. 1515, as amended May 1, 2017, p. 2.)  Reasonable certainty is important to Department of Housing and Community Development officials, so they understand the impact of a locality's housing element in deciding whether to approve it. Reasonable certainty is important to neighbors, who want to know how big a building can be erected next door, and it is important to those who build housing, so they know what size project can be approved for a particular site. Yet reasonable certainty in application—that is, objectivity—is precisely the test that the height provisions of the Guidelines fail.

The City protests that an argument over interpretation does not mean the Guidelines lack objectivity.  In another case posing a discrete interpretive issue that might be true, but here the ambiguities in the Guidelines' height standard are pervasive and not amenable to objective resolution.  The problem is fundamentally different from the narrow interpretive issue posited by amici:  a quantitative ordinance requiring roads to be designed to support a load of " '25 ton[s],' " which leaves to interpretation whether a short

19

ton, a long ton, or a metric ton is intended. A definitional question of this type can be resolved objectively (e.g., by reference to common usage in a community or trade), leaving room for a single standard, knowable in advance, to be applied to all. The standards imposed by the height Guidelines, by contrast, are too ambiguous to be similarly susceptible to objective interpretation.

To resolve the pervasive ambiguities, the City asks us to defer to its interpretation of its own Guidelines. As the City points out, where the meaning of an enactment is at issue, the interpretation of an agency charged with enforcing it is one tool available to the court as it exercises its independent judgment (*Yamaha, supra,* 19 Cal.4th at pp. 6–8; *Ocean Park Associates v. Santa Monica Rent Control Bd.* (2004) 114 Cal.App.4th 1050, 1062), and in appropriate situations we may accord " 'great weight' " to the agency's construction (*Yamaha,* at p. 12; *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 911 (*Boling*)). This rule applies to a city's interpretation of its own ordinances. (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434; *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1193.) Crucially, however, such weight is given to *consistent* administrative construction of an enactment, particularly when the agency's interpretation is "of long standing." (*Mason v. Retirement Board* (2003) 111 Cal.App.4th 1221, 1228, citing *Yamaha, supra,* 19 Cal.4th at p. 13; see *Tower Lane Properties v. City of Los Angeles* (2014) 224 Cal.App.4th 262, 278.) "[L]awmakers are presumed to be aware of long-standing administrative practice and, thus, . . . the failure to substantially modify a provision[] is a strong indication the administrative practice was consistent with underlying legislative intent." (*DeYoung v. City of San Diego* (1983) 147

Cal.App.3d 11, 18–19, disapproved on another ground in *Yamaha*, *supra*, 19 Cal.4th at p. 15.)

This principle of deference does not assist the City here because the record does not show a long-standing and consistent interpretation of the Guidelines' requirement for "a transition or step in height." Rather, the record suggests the opposite. In its initial design review, the planning staff concluded that, with certain modifications, the project satisfied the Guidelines. Staff reached this conclusion *after* the design review consultant for the City reported, in a letter attached to the staff report, that the height differential at the portion of the project that was not stepped back adjacent to the Engle Road house was "problematic[]" but would be substantially mitigated by the trees at the property line and the street trees. Thus, fully aware of the issue, the City's planning staff nevertheless assessed that the project was consistent with the Guidelines, and so reported to the Commission. The record does not indicate the Commission disagreed with this assessment when it directed staff to prepare findings to deny the project. Rather, the commissioners expressed more general concern about the size and density of the project in relation to the neighboring residences. Staff pointed to an inconsistency with the height Guideline for the first time only *after* the Commission decided to deny the application. This record belies the notion that the City has consistently construed the height standards in the manner it now urges.

The City also argues that deference is appropriate because of its greater familiarity and expertise in applying the Guidelines. In an appropriate case, courts "are inclined to defer to a government entity's interpretation of its own regulation ' "since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical

21

implications of one interpretation over another." ' " (*J. Arthur Properties, II, LLC v. City of San Jose* (2018) 21 Cal.App.5th 480, 486; see also *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 305 [deferring to city's determination of a project's consistency with its general plan "because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity"]; *Boling*, *supra*, 5 Cal.5th at p. 911 [affording greater weight to an agency's construction of a statute " 'when " 'the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion' " ' "].)  Such deference makes sense where a local agency must weigh and balance competing interests in applying policies that require broad discretion.  (*East Sacramento Partnerships*, at p. 305.)  But land use decisions under the HAA are different.  Precisely because the HAA cabins the discretion of a local agency to reject proposals for new housing, it is inappropriate for us to defer to the City's interpretation of the Guidelines. We must engage in " 'more rigorous independent review . . . in order to prevent the City from circumventing what was intended to be a strict limitation on its authority.' " (*Ruegg*, *supra*, 63 Cal.App.5th at p. 299, quoting *San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 669–670.)

The City's request that we defer to its interpretation of the Guidelines serves as a tacit acknowledgement that the height Guidelines require something other than objective interpretation.  But the HAA requires municipalities to apply standards that are both "objective" and "in effect at the time that the application was deemed complete" (§ 65589.5, subd. (j)(1)),

not to apply standards that are rendered objective only by adding an after-the-fact interpretive gloss.

Our conclusion that the applicable portion of the Guidelines does not provide an objective standard is confirmed by considering subdivision (f)(4) of the HAA, which complements and reinforces subdivision (j)'s objectivity requirement. Added in 2017 as the Legislature sought to strengthen the HAA, subdivision (f)(4) deems a project consistent with applicable objective standards "if there is substantial evidence that would allow a reasonable person to conclude that the [project] is consistent, compliant, or in conformity" with such standards. (§ 65589.5, subd. (f)(4).) The City sees all manner of mischief in this standard—as we will see shortly in the next section—but where a standard is truly objective, in that it is "*uniformly verifiable* by reference to an external and uniform benchmark" (§ 65589.5, subd. (h)(8), italics added), there is little to no room for reasonable persons to differ on whether a project complies with such a benchmark. Subdivision (f)(4) is intentionally deferential to housing development. It is also an excellent backstop to ensure that the standards a municipality are applying are indeed objective.

Applying subdivision (f)(4) in this case leads to the conclusion that the City violated the HAA for much the same reason as we have found the pertinent Guideline not to be objective. A reasonable person could read the Guideline to allow a "transition" comprised of trees rather than a stepback in building height, or could find a sufficient stepback where the building recedes from a project footprint that includes the ground-floor trellises. Reasonably concluding that the proposed landscaping and trellises do provide the requisite transition, the City's planning staff and consultant originally found the project consistent with the Guidelines, while the Commission and City

23

Council later determined, again reasonably, that the project does not comply because of an insufficient stepback of (at least) the third floor. The plausibility of both views demonstrates that the height guidelines are not objective *and* that a reasonable person could conclude the project satisfies them. Whether one focuses on the first, subdivision (j)(1) question or on the second, applying subdivision (f)(4), the effect is the same.

To the extent the question of whether the City denied the project for failure to conform to an objective standard is close, recall that the City has the burden to show its decision conformed to the HAA (§ 65589.6), and that the Legislature has declared the HAA must be interpreted and implemented to "afford the fullest possible weight" to the approval of housing (§ 65589.5, subd. (a)(2)(L)). Although the HAA should not be construed to prohibit local governments from requiring compliance with "objective, quantifiable, written development standards" that are consistent with meeting the jurisdiction's share in regional housing need (§§ 65589.5, subd. (f)(1), 65583), the criteria at issue here are neither objective nor quantifiable. We therefore conclude that the City did not "proceed[] in the manner required by law" in denying approval of the project based on its interpretation of the height Guideline, and the trial court erred in determining otherwise. (Code Civ. Proc., § 1094.5, subd. (b).)

In reaching this conclusion, we emphasize two things. First, the HAA does not prevent local agencies from establishing and enforcing appropriate design review standards. But those standards must be objective and they must be in place at the time an application is complete. (§ 65589.5, subd. (j)(1).) Second, even with respect to standards that are not objective, the HAA does not bar local agencies from imposing conditions of approval; rather, it prohibits conditions of approval "that the project be developed *at a lower*

24

*density*," unless public health or safety findings are made. (§ 65589.5, subd. (j)(1), italics added.) Thus, nothing in our opinion prevents the City from imposing appropriate conditions of approval to mitigate any effects the height differential may have on the surrounding neighborhood, as long as those conditions do not reduce the density of the project.

## III. Constitutionality of HAA

Having concluded the City abused its discretion in denying the project based on inconsistency with the height guidelines, we must reverse unless persuaded by the City's arguments that the HAA transgresses provisions of the California Constitution. We consider the trial court's ruling that the HAA in general and subdivision (f)(4) in particular violate the home rule doctrine for charter cities, and the prohibition on delegation of municipal functions. We also consider the City's contention that subdivision (f)(4) would result in a meaningless, predetermined hearing that does not comport with due process.

In so doing, we reject out of hand the City's contention that CARLA waived its defense of the HAA's constitutionality when it failed to address this issue in the trial court. Even if CARLA's failure to anticipate and respond to a constitutional challenge that was neither pleaded nor argued could somehow oblige us to acquiesce in striking down a duly enacted statute—a proposition absurd on its face—the trial court's cryptic invitation to address the enforceability of subdivision (f)(4) said nothing about the enforceability of the HAA as a whole and made no reference to the constitutionality of the statute. There was no waiver of the issue we now consider, and in any event the Attorney General has, as authorized by statute, intervened to defend the HAA's constitutionality. (Code Civ. Proc., §§ 664.5, subd. (e), 902.1.)

25

## A. Home Rule

California's Constitution authorizes charter cities to "govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs." (*State Building & Construction Trades Council of California v. City of Vista* (2012) 54 Cal.4th 547, 555; Cal. Const., Art. XI, § 5.) As to truly municipal affairs, "charter cities are 'supreme and beyond the reach of legislative enactment.'" (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 12 (*California Fed. Savings*).)

To determine whether the Legislature may exert control over the actions of a charter city despite its right to home rule, we apply a four-part test: First, we "determine whether the city ordinance at issue regulates an activity that can be characterized as a 'municipal affair.' [Citation.] Second, the court 'must satisfy itself that the case presents an actual conflict between [local and state law].' [Citation.] Third, the court must decide whether the state law addresses a matter of 'statewide concern.' [Citation.] Finally, the court must determine whether the law is 'reasonably related to . . . resolution' of that concern [citation] and 'narrowly tailored' to avoid unnecessary interference in local governance [citation]. 'If . . . the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5(a) from addressing the statewide dimension by its own tailored enactments.'" (*City of Vista*, at p. 556, quoting *California Fed. Savings*, at pp. 16, 17, 24; accord, *Anderson v. City of San Jose* (2019) 42 Cal.App.5th 683, 698–699 (*Anderson*).) In this analysis, "'the question of statewide concern is the bedrock inquiry through which the conflict between state and

local interests is adjusted.' " (*Anderson*, at p. 699.) "[W]e exercise our independent judgment in interpreting the state law to identify whether it addresses a matter of statewide concern and can be applied constitutionally to the City." (*Id.* at pp. 704–705.)

The City does not defend the court's sweeping rejection of the HAA, limiting its constitutional challenge instead to what it characterizes as CARLA's and the Attorney General's "extreme" interpretation of subdivision (f)(4). Despite the parties' failure to defend the trial court's conclusion that the HAA as a whole is unconstitutional, this was arguably an alternate basis for the trial court's decision so we will consider the constitutionality of the HAA as a whole—its mandate that local governments rely only on objective standards to deny an application and the reasonable person standard of subdivision (f)(4).

As to the first prong of the home rule test, the parties agree that planning and zoning laws are a traditional municipal concern. (*Ruegg*, *supra*, 63 Cal.App.5th at p. 311; *Center for Community Action & Environmental Justice v. City of Moreno Valley* (2018) 26 Cal.App.5th 689, 704–705)

As to the second prong, to the extent City ordinances allow proposed housing developments to be rejected based on standards that are not objective, municipal law appears directly to conflict with the HAA. (See *Ruegg*, *supra*, 63 Cal.App.5th at p. 314; cf. *City of Huntington Beach v. Becerra* (2020) 44 Cal.App.5th 243, 270–271 [finding conflict where statute directly restricted regulation of city police force].) For purposes of this analysis, we will assume an actual conflict between the HAA and the City's design review standards.

As to the third step, the parties agree that the provision of housing is a matter of statewide concern. The term " 'statewide' refers to all matters of

more than local concern and thus includes matters the impact of which is primarily regional rather than truly statewide." (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 505.)  The City argues, however, that subdivision (f)(4) of the HAA does not itself address a matter of statewide concern because California's housing crisis has other causes in addition to local governments denying approval for housing developments— causes including high construction costs, a shortage of construction labor, and delays caused by the California Environmental Quality Act (Pub. Res. Code, § 21000 et seq.; CEQA).  And, the City contends, CARLA and the Attorney General have not shown that the housing crisis is caused by local governments' actions in denying applications for housing projects.  We find the City's argument unpersuasive.

The Legislature has declared the shortfall in housing in California to be a matter of statewide importance (§ 65589.5, subds. (a)(1) & (2), (g)), and in other contexts both our high court and appellate courts have acknowledged the statewide nature of the interest in providing a stock of housing sufficient to meet the needs of all Californians.  (See, e.g., *San Jose, supra*, at p. 441; *Ruegg, supra*, 63 Cal.App.5th at p. 312, *Anderson, supra*, 42 Cal.App.5th at pp. 708–709, 711; *Buena Vista Garden Apartments Assn. v. City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 307.)  The parties and amici have submitted abundant legislative history and other materials that reinforce the conclusion that a shortage of housing in our state has led to escalating costs that for many have rendered adequate shelter unaffordable.

The City's argument looks past the statewide concern with a shortage of housing to focus instead on the means the HAA employs to address that concern (i.e., limits on local governments' ability to disapprove or restrict projects).  The City contends there has been no showing these actions by local

28

governments are a matter of statewide concern, but the court in *Ruegg* recently rejected a similar argument. A city there argued that the statewide interest in increasing affordable housing does not " 'translate into a statewide interest in eliminating local landmark preservation authority.' " (*Ruegg, supra*, 63 Cal.App.5th at p. 313.) Our colleagues rejected this theory as an "inapposite" framing of the issue, holding that a statute that streamlines approval of certain multifamily housing projects with below-market-rate units does not impermissibly interfere with a city's " 'home rule' authority over historic preservation." (*Ruegg*, at pp. 310–315.) That the Legislature could have increased affordable housing without undermining local authority over historical preservation was immaterial: "the constitutionality of [the statute] does not turn on there being a statewide interest in limiting local historical preservation authority but rather on whether the statewide interest in increasing affordable housing sufficiently justifies the legislation's impact on that authority." (*Id.* at p. 313.) Indeed, "historical preservation is precisely the kind of subjective discretionary land use decision the Legislature sought to prevent local government from using to defeat affordable housing development." (*Id.* at p. 315.) Similarly here, we consider not whether there is a statewide interest in limiting local governments' authority to disapprove projects that comply with objective standards, but whether there is a statewide interest in increasing the state's housing supply. As our high court has explained, our inquiry is not whether the Legislature has enacted "prudent public policy" or whether its enactments will be "advisable or effective"; rather, it is whether the problem it addresses "is of sufficient extramural dimension to support legislative measures reasonably related to its resolution." (*California Fed. Savings, supra*, 54 Cal.3d at pp. 23–24.)

We have no doubt that this standard is met.  The Legislature's findings and the mandates of the HAA itself confirm that the purpose of the statute is to address a matter of statewide concern.  When extending the statute to reach charter cities in 1990, the Legislature found that actions and policies of local governments limiting the approval of affordable housing were a partial cause of the "excessive cost of the state's housing supply."  (Former § 65589.5, subd. (a)(2); Stats. 1990, ch. 1439, § 1.)  In 2001, the Legislature deleted the word "affordable" from this finding, concluding that local governments' actions in limiting the approval of "housing" in general were a partial cause of its excessive cost.  (Former § 65589.5, subd. (a)(2), now § 65589.5, subd. (a)(1)(B); Stats. 2001, ch. 237, § 1.)  The Legislature reinforced this finding in the 2017 amendments, which declared that the Legislature intended in enacting and expanding the HAA to increase the approval of new housing by curbing local governments' ability to deny or reduce the density of housing projects.  (§ 65589.5, subd. (a)(2)(J) & (K); Stats. 2017, ch. 378, § 1.5.)  Although we " 'may not simply abdicate to the Legislature' [citation] the determination of statewide concern and the corresponding assignment of power between local and state government," we nevertheless " 'defer[] to legislative estimates regarding the significance of a given problem and the responsive measures that should be taken toward its resolution.' " (*Anderson*, *supra*, 42 Cal.App.5th at pp. 707; see *California Fed. Savings*, *supra*, 54 Cal.3d at p. 24; *Ruegg*, *supra*, 63 Cal.App.5th at p. 312.)  The City has done nothing to cast doubt on these legislative findings, which are well supported by case law.  The HAA, which has the express purpose of ameliorating the housing crisis and seeks to accomplish this goal by increasing approval of housing developments (§ 65589.5, subd. (a)(2)(K)),

"patently addresses a matter of statewide concern." (See *Ruegg*, *supra*, 63 Cal.App.5th at p. 312.)

In the fourth and final prong of our inquiry, we decide whether the statute is " ' "reasonably related to . . . resolution" ' of the identified statewide concern [citation] and is ' "narrowly tailored" to avoid unnecessary interference in local governance.' " (*Anderson*, *supra*, 42 Cal.App.5th at pp. 716–717.) At the outset, we agree with the Legislature that limiting local governments' ability to deny new development based on subjective criteria is reasonably related to providing additional housing. (§ 65589.5, subds. (a)(1)(B), (a)(2)(J) & (K).) And we also have no doubt that the statute appropriately limits its incursions into municipal authority. (See *Anderson*, at pp. 716–717.) The HAA leaves local governments free to establish and enforce policies and development standards appropriate to local circumstances, as long as those policies and standards are consistent with meeting the jurisdiction's share of the regional housing need and, if used to deny or reduce the density of housing developments, are *objective* so that their application is predictable. (§ 65589.5, subds. (f)(1) & (j).)

The HAA's reach is further narrowed by other provisions. Local governments are not barred from imposing conditions of approval that do *not* reduce density. (§ 65589.5, subd. (j)(1).) And the HAA includes an escape valve that allows municipalities to deny a project that would have an unavoidable adverse impact on health and safety. (§ 65589.5, subd. (j)(1)(A) & (B).) These provisions indicate not only that the HAA is reasonably related to the statewide problem the Legislature sought to redress but also that it " 'limit[s] the incursion into [the] city's municipal interest' " so as to be narrowly tailored for purposes of the home rule analysis. (*Anderson*, *supra*, 42 Cal.App.5th at pp. 716–717.)

31

The City asserts that subdivision (f)(4) is not narrowly tailored to the extent it is interpreted to allow the local agency's judgment to be replaced with "that of any person who can provide evidence of consistency"; this, the City urges, impinges on the local government's "core functions" of hearing and weighing evidence and deciding by majority vote whether a project is consistent with legal requirements. We disagree that a proper reading of subdivision (f)(4) leads to a conclusion the HAA is not narrowly tailored. The effect of subdivision (f)(4) is simply to hold local governments to a standard of objectivity in their decisionmaking, such that if a *reasonable* person could find a housing development in compliance, it will be so deemed. If a municipality wishes to enforce limitations on housing developments, it must promulgate standards that are not so malleable that reasonable minds could differ on whether they are met. In short, the HAA does not wrest control from local governments so much as require them to proceed by way of clear rules adopted in advance, rather than by ad hoc decisions to accept or reject proposed housing.

In finding the HAA not narrowly tailored, the trial court suggested an appropriate limitation would be to apply the statute only where the administrative record showed objective evidence of bad faith by the public agency. But the parties have made no showing that this state's insufficient supply of housing derives substantially from bad faith actions by cities and counties, and we will not presume that municipalities routinely proceed in bad faith when they apply their development laws and standards. Individual jurisdictions may well make decisions in good faith that nevertheless contribute to the collective shortfall in housing. It is to this collective action problem that the HAA is addressed, and it is because the Legislature concluded that earlier versions of the statute were not having a sufficient

32

impact that it amended the statute repeatedly.  (See, e.g., Stats. 2017, ch. 378, § 1.5.)  Given the extent and intractability of the housing shortfall, we see nothing improper in the Legislature addressing it on a statewide basis, without limiting the statute to local agencies that act in bad faith.  We reject the trial court's proposed limitation.

## B.  Delegation of Municipal Functions

California's Constitution prohibits the Legislature from "delegat[ing] to a private person or body power to . . . perform municipal functions."  (Cal. Const., Art. XI, § 11, subd. (a).)  The City contends, and the trial court apparently agreed, that subdivision (f)(4) violates this prohibition.  The City's theory is that subdivision (f)(4) would allow *anyone*—even a private person such as a project proponent—to place into the record evidence indicating a project is consistent with objective standards and thereby force a local agency to approve the project.  This, the City argues, would divest local authorities of final decisionmaking control in violation of the prohibition on delegation of municipal functions.  (Citing *Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 155.)

This argument is unpersuasive because subdivision (f)(4) does not "divest the [City] of its final decisionmaking authority."  (*County of Riverside v. Public Employment Relations Bd.* (2016) 246 Cal.App.4th 20, 28; accord, *County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 340.)  As we have already explained, nothing in the HAA prevents cities from establishing and enforcing objective land use and design standards that are consistent with their other obligations.  (See § 65589.5, subds. (f)(1) & (j).)  Although subdivision (f)(4) of the HAA lowers the burden to show a project is consistent with applicable objective standards, the statute cedes municipal authority to no private person.  (Cf. *County of Riverside v. Superior Court* (2003) 30

Cal.4th 278, 283, 294 [Legislature impermissibly delegated authority to private person when it required local agencies to submit to private arbitration].)  A city's governing body retains broad authority, subject to judicial review, to exercise decisionmaking authority:  to determine whether there is substantial evidence from which a reasonable person could conclude the project is consistent with the city's applicable objective requirements; to deny or reduce the density of a project that does not meet such standards or that causes an unavoidable adverse impact on public health or safety; and to impose conditions of approval that do not reduce the project's density where applicable objective standards are met.  (§ 65589.5, subd. (f)(4) & (j)).  Viewing subdivision (f)(4) in the context of the entire HAA, we find no violation of the municipal nondelegation doctrine.

We are untroubled by the City's suggestions that a governing body would be forced to approve a project if a proponent succeeds in "dig[ging] up" "self-serving evidence," regardless of its weight, and that if a single staff member or member of the governing body opines that a project complies with objective standards then the local agency would be compelled to find it so.  The usual meaning of "substantial evidence" is "evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' "  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.)  In determining whether evidence is substantial, the test is whether it is " ' "reasonable for a trier of fact to make the ruling in question in light of the whole record." ' "  (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992; see Code Civ. Proc., § 1094.5, subd. (c) [in administrative mandamus action, court reviews whole record to determine whether findings are supported by substantial evidence].)  And subdivision (f)(4) of the HAA employs the

34

objective standard that evidence must be such as to allow a *reasonable person* to conclude the project is compliant. (See *Speier v. The Advantage Fund, LLC* (2021) 63 Cal.App.5th 134, 147.) There is thus no basis for concern that subdivision (f)(4) would require project approval based solely on the unsupported opinion of a single person, or on evidence that a reasonable person would not find credible and persuasive.

In short, the City's claim that subdivision (f)(4) impermissibly delegates municipal authority fails because the HAA leaves to the public agency final authority to approve, condition, or deny a project.

## C. Due Process

The City also contends that subdivision (f)(4) violates the due process rights of neighboring landowners by depriving them of a meaningful opportunity to be heard before a housing development is approved.

Land use decisions that "substantially affect the property rights of owners of adjoining parcels may constitute deprivations of property for purposes of procedural due process" (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 853), and those landowners are entitled to notice and an opportunity to be heard before a project's approval (*Horn v. County of Ventura* (1979) 24 Cal.3d 605, 616; *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549, 570). Due process requires an opportunity to be heard " ' " 'at a meaningful time and in a meaningful manner.' " ' " (*Natural Resources Defense Council v. Fish & Game Com.* (1994) 28 Cal.App.4th 1104, 1126 (*NRDC*), citing *Mathews v. Eldridge* (1976) 424 U.S. 319, 333.) However, "action involving only the nondiscretionary application of objective standards" does not entitle neighboring landowners to these protections. (*Horn*, at p. 616.)

The City argues that subdivision (f)(4) renders local government review a useless exercise because if anyone submits evidence that a project is consistent with applicable standards the project is " 'deemed' " consistent and must generally be approved. The City points to *NRDC*, in which one party contended that a substantial evidence standard, while appropriate for judicial review, was inappropriate to the *initial* decision of an agency, because "if the petitioner adduces substantial evidence it wins, no matter how compelling the contrary evidence, [which] is the antithesis of due process." (*NRDC, supra*, 28 Cal.App.4th at p. 1126.) *NRDC* is not persuasive because the court merely noted this argument, observing there was no need to address it since the court's interpretation of the relevant statute avoided the issue.[4] (*NRDC*, at p. 1126; Fish & G. Code, § 2074.2.) Moreover, *NRDC* did not consider—as we do here—the proper procedure when the issue is whether *objective* standards are met.

Even assuming due process protections apply to a municipality's determination whether a project complies with objective standards under subdivision (f)(4), we see no violation here. As we have already discussed, the substantial evidence standard requires evidence that is " 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value' "

---

[4] We note that it is not unheard of for agencies to be required to use a substantial evidence standard in making decisions. CEQA requires the preparation of an environmental impact report if "substantial evidence supports a fair argument" that a proposed project may have a significant effect on the environment, even if there is also substantial evidence it will not. (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927.) The City seeks to distinguish this rule as applying only to the initial decision whether to prepare an environmental impact report, not to the final decision whether to approve a project. We do not give undue weight to the CEQA analogy, but it shows that in appropriate circumstances agencies may be required to make decisions on a substantial evidence standard.

(*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1006) in light of the whole record (*In re Yolanda L.*, *supra*, 7 Cal.App.5th at p. 992). Nothing in subdivision (f)(4) prevents project opponents from seeking to demonstrate that the evidence of compliance does not meet this standard. Nor does the statute prevent neighbors from presenting, or the agency from considering, evidence that conditions of approval that do not reduce density could mitigate undesirable effects on neighbors, or that the project would have an unavoidable "specific, adverse impact upon the public health or safety" if approved at the proposed density. (See § 65589.5, subd. (j).) Subdivision (f)(4) may affect which arguments will carry the day, but it does not deprive a project's opponents of a meaningful opportunity to be heard.

We return to the history of the HAA. As the Legislature has steadily strengthened the statute's requirements, it has made increasingly clear that those mandates are to be taken seriously and that local agencies and courts should interpret them with a view to giving "the fullest possible weight to the interest of, and the approval and provision of, housing." (§ 65589.5, subd. (a)(2)(L).) The HAA is today strong medicine precisely because the Legislature has diagnosed a sick patient. We see no inconsistency between the provisions of the HAA and the California Constitution.

## VI. Further Issues

In denying the application, the City pointed to no assertedly objective standard that the project did not meet, other than the height Guideline. In the trial court, the City argued as a separate basis for denying the writ that the project violated the City's objective standards for the dimensions of parking spaces. On appeal, the City does not contend we may affirm on this theory. Rather, it argues that if a writ of mandate issues, the City should be

37

allowed to consider the project's compliance with parking standards on remand.

The parties agree that if we reverse the judgment of the trial court, the appropriate remedy is to direct the trial court to issue a writ of mandate ordering the City to comply with the HAA. Nothing we say is intended to preclude the City from reviewing on remand the project's compliance with objective standards, including parking standards in effect at the time the application was deemed complete. (§ 65589.5, subd. (j)(1).)

## DISPOSITION

The judgment of the trial court is reversed. The trial court shall issue a writ of mandate directing the City to (1) vacate its February 5, 2018 action upholding the Planning Commission's decision to deny the application, and (2) reconsider the challenge to the Planning Commission's decision in accordance with the views expressed in this opinion. The trial court may make any other appropriate orders that are consistent with this opinion.

Appellants shall recover their costs on appeal.


TUCHER, J.*


WE CONCUR:

STREETER, Acting P. J.
BROWN, J.

---

* Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution.

Trial Court:                        San Mateo County Superior Court

Trial Judge:                        Hon. George A. Miram

Counsel for Appellants:             Holland & Knight, Jennifer L. Hernandez, Daniel R. Golub, and Emily M. Lieban

Counsel for Amicus Curiae           Miller Starr Regalia, Bryan W. Wenter;
on behalf of Appellants:            Paul B. Campos for Building Industry Association – Bay Area, San Francisco Bay Area Planning and Urban Research Association, Bay Area Council, and Housing Action Coalition

Counsel for Amicus Curiae           Californians for Homeownership: Matthew
on behalf of Appellants:            Gelfand; California Association of Realtors®: June Babiracki Barlow

Counsel for Amicus Curiae           Reed Smith, Raymond A. Cardozo and Kathryn
on behalf of Appellants:            M. Bayes for Habitat for Humanity Greater San Francisco

Counsel for Amicus Curiae           Christopher S. Elmendorf, Michelle Wilde
on behalf of Appellants:            Anderson, Anika Singh Lemar, and Dave Owen for Law Professors

Counsel for Respondents:            Goldfarb & Lipman, Dolores Bastian Dalton, Barbara E. Kautz, James T. Diamond, Jr., and Rye P, Murphy; Shawn Mason, City Attorney

Counsel for Amicus Curiae           Rural County Representatives of California,
on behalf of Respondents:           Arthur J. Wylene; California State Association of Counties, Jennifer B. Henning

Counsel for Amicus Curiae           Colantuono, Highsmith & Whatley, Andrew L.
on behalf of Respondents:           Jared, and Matthew T. Summers for League of California Cities.

Counsel for Intervener: Xavier Becerra and Rob Bonta, Attorneys General; Thomas S. Patterson and Daniel A. Olivas, Senior Assistant Attorneys General; Mark R. Beckington and Christina Bull Arndt, Supervising Deputy Attorneys General; and Jonathan M. Eisenberg and David Pai, Deputy Attorneys General

*San Francisco Bay Area Renters Federation et al. v. City of San Mateo et al.* (A159320, A159658)